**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BROWNING–FERRIS INDUSTRIES, CHEMICAL SERVICES, INC., Respondent.**

No. 81–3069.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 17, 1982.

Decided Feb. 17, 1983.

Linda Dreeben, N.L.R.B., Washington, D.C., for petitioner.

A. Martin Wickliff, Jr., Fulbright & Jaworski, Houston, Tex., for respondent.

Before POSNER and COFFEY, Circuit Judges, and CAMPBELL, Senior District Judge.*

POSNER, Circuit Judge.

The Board asks us to enforce its order finding that the respondent, BFI, committed an unfair labor practice by terminating two workers who refused to cross a picket line at a customer's premises. BFI is in the business of hauling chemical wastes. It employs six truck drivers, driving six trucks, to pick up the wastes from storage tanks on its customers' premises and haul them to disposal sites. One of its major customers is an International Harvester plant, whose employees were lawfully on strike, and picketing the plant, between November 1979 and April 1980. On February 19, 1980, International Harvester placed an order that would have required all six of BFI's trucks to fill. Two of the drivers said they would not cross the picket line, and BFI told them they would be permanently replaced. The next day, before permanent replacements had actually been hired, International Harvester reduced its order to two truckloads, but BFI went ahead and hired permanent replacements.

The first question we consider, one of first impression in this circuit, is whether a refusal to cross a picket line at the premises of an employer's customer rather than of the employer himself is protected activity under section 7 of the National Labor Relations Act, 29 U.S.C. § 157, which gives workers the right "to form, join or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of their mutual aid or protection . . . ." If it is not protected activity then BFI, which is accused only of violating section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1) (interference with protected activity), cannot be guilty of an unfair labor practice in getting rid of the balking drivers.

The Board does not suggest that the refusal to cross the picket line was concerted action between the two drivers or part of a campaign to organize BFI (though there was some organizing activity afoot at BFI), or was otherwise directly related to the drivers' wages or working conditions. It was a gesture of solidarity with the striking workers at the International Harvester plant. Nor, on the other hand, is it suggested that the drivers were trying to disrupt BFI's business, as a way of inducing BFI to bring pressure on International Harvester to settle with the strikers or even of inducing BFI to stop doing business with International Harvester. There is in short no suggestion that the drivers were fomenting a secondary boycott—concerted, but dis-

* Of the Northern District of Illinois.

favored, activity under the federal labor laws.

But it does not strain the language of section 7 to regard the two drivers as having engaged in a concerted activity that consisted of picketing on the part of some workers and refusing to cross the picket line on the part of others, and that was, at least in part, for the drivers' own aid or protection and therefore satisfied the mutuality requirement. Only the second proposition—that the drivers themselves benefited—requires elaboration. The drivers may have felt that strengthening the union movement by honoring a union's picket line would promote their own economic interests as workers. "[T]he solidarity so established [by aiding another employee's grievance against his employer] is 'mutual aid' in the most literal sense." *NLRB v. Peter Cailler Kohler Chocolates Co.*, 130 F.2d 503, 505–06 (2d Cir.1942) (L. Hand, J.). Judge Hand's statement is not just "ideological polemics ... suggestive of a tract on class welfare," as charged in Haggard, *Picket Line Observance as Protected Concerted Activity*, 53 N.C.L.Rev. 43, 98 n. 230 (1974), even in a case such as this where the workers in question are not members of a union. They may have hoped to become members—hoped that a union victory at the International Harvester plant would encourage a successful organizing effort at their own plant. Or they may have believed that the union movement improves the working conditions of nonunion workers—that employers treat such workers better in order to ward off unionization. There is a third possibility. We do not know which workers were on strike at the International Harvester plant, but if they do the same type of work that BFI's drivers do an increase in their wages or benefits through a successful strike might put competitive pressure on BFI to offer better terms to its drivers.

Under any of these hypotheses, the relationship between the challenged conduct and the workers' practical, nonideological self-interest as workers would be as close as it was in *Eastex Inc. v. NLRB*, 437 U.S. 556, 569–70, 98 S.Ct. 2505, 2514, 57 L.Ed.2d 428 (1978), where the Supreme Court held that the distribution on the employer's property of a newsletter criticizing the President's veto of an increase in the minimum wage was protected activity even though the employees were being paid more than the vetoed minimum wage; and in many other cases as well, such as *Kaiser Engineers v. NLRB*, 538 F.2d 1379, 1384–85 (9th Cir. 1976), which held that lobbying in opposition to proposed changes in the immigration laws was protected activity.

■ A natural reading of section 7 leads to the conclusion that refusing to cross a picket line at the premises of an employer's customer is protected activity, and when we consider, in addition, the pro-union ambience of the Wagner Act, and the Supreme Court's frequent rejection, as in *Eastex Inc., supra*, 437 U.S. at 565–67, 98 S.Ct. at 2512–13, of a narrow reading of section 7, we conclude that the natural reading is also the legally correct one.

We are not alone in so concluding. For the last twenty years the Board has held that refusing to cross a picket line at the premises of an employer's customer is protected activity, see, e.g., *Redwing Carriers, Inc.*, 137 N.L.R.B. 1545 (1962), enforced *sub nom. Teamsters, Etc., Local Union 79 v. NLRB*, 325 F.2d 1011 (D.C.Cir.1963); *Overnite Transport Co.*, 212 N.L.R.B. 515 (1974), and its view, so steadily maintained through several changes of Administration, is entitled to consideration. Most circuits that have considered the issue have agreed with the Board, see *NLRB v. Southern California Edison Co.*, 646 F.2d 1352, 1363–64 (9th Cir.1981); *NLRB v. Gould, Inc.*, 638 F.2d 159, 163 (10th Cir.1980); *NLRB v. Alamo Express, Inc.*, 430 F.2d 1032, 1036 (5th Cir. 1970); *Teamsters, Etc., Local Union 657 v. NLRB*, 429 F.2d 204, 205 (D.C.Cir.1970) (per curiam), though the Tenth Circuit (*Gould*) only in dictum. Although the Second Circuit is usually grouped with these circuits, on the strength of *NLRB v. Rockaway News Supp. Co.*, 197 F.2d 111, 113 (2d Cir. 1952), aff'd on other grounds, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953), this classification is mistaken; the *Rockaway* opinion

states that honoring a picket line on the customer's premises is protected activity only if done by the employee after work or otherwise on his own time rather than his employer's. 197 F.2d at 113. *NLRB v. L.G. Everist, Inc.,* 334 F.2d 312, 316–18 (8th Cir. 1964), is like *Rockaway*; but a later Eighth Circuit case, *Montana-Dakota Util. Co. v. NLRB,* 455 F.2d 1088, 1091 (8th Cir.1972), seems to treat the question as open. The First Circuit avoided deciding the question in *NLRB v. William S. Carroll, Inc.,* 578 F.2d 1, 3 (1st Cir.1978), though its opinion seems skeptical of the Board's position. See also *NLRB v. C.K. Smith & Co.,* 569 F.2d 162, 165 n. 1 (1st Cir.1977).

BFI presses on us cases holding that employers may prohibit union solicitation during working hours, see *Republic Aviation Corp. v. NLRB,* 324 U.S. 793, 803 n. 10, 65 S.Ct. 982, 988 n. 10, 89 L.Ed. 1372 (1945) ("working time is for work"), and may prohibit slowdowns, see *Elk Lumber,* 91 N.L.R.B. 333, 336–38 (1950), and other work interruptions, see *Excavation-Construction, Inc. v. NLRB,* 660 F.2d 1015, 1020–21 (4th Cir.1981). But these cases involve greater potential for disruption of the employer's business than does a refusal to cross a picket line at a single customer's premises, since in the latter case the employees remain available to serve their employer's other customers. Closer are the cases, notably *NLRB v. Union Carbide Corp.,* 440 F.2d 54, 55–56 (4th Cir.1971), and, in the circuit, *Gary Hobart Water Corp. v. NLRB,* 511 F.2d 284, 287, 289 (7th Cir.1975), which hold that honoring a picketing-line thrown up by workers in a different bargaining unit at the same plant is protected activity. (*Hobart* overruled, though perhaps inadvertently because it did not cite, *NLRB v. Illinois Bell Tel. Co.,* 189 F.2d 124 (7th Cir.1951).) It would make no difference if it was another plant of the same employer. If it is a plant of another employer the link to the employee's interest is more attenuated but not so much so as to be outside the Board's reach in interpreting what appears to be the deliberately broad language of section 7.

■ There is another reason to treat such conduct as protected. Such treatment allows a more flexible comparison of the benefit to the workers and the burden to the employer. To hold such conduct unprotected would allow the employer to suppress it even if its cost to him was trivial. Holding that it is protected does not make it sacrosanct but does require the employer to demonstrate good cause for suppression—and to the issue of good cause we now turn.

■ The drivers' refusal to cross the International Harvester picket line was not provoked by BFI and was therefore like an "economic" strike as distinct from a strike provoked by an employer's unfair labor practice. Just as a company is allowed to replace economic strikers to keep its business running without being deemed to have interfered with protected activity in violation of section 8(a)(1), so it may continue serving a customer by replacing workers who are unwilling to cross a picket line at a customer's premises. See *Union Carbide Corp., supra,* 440 F.2d at 57. No doubt BFI could have survived even if it had been unable to do any business with International Harvester during the five months that the strike was on. But survival is not the test. The Board concedes that BFI did not have to write off any customer—that it could take reasonable steps to continue filling International Harvester's orders.

The issue can be narrowed still further. On February 19 International Harvester placed an order that would have required all six of BFI's trucks to fill. BFI could not have been faulted had it gone out that very day and hired permanent replacements for the two drivers who refused to cross the International Harvester picket line. It is difficult to hire temporary replacements— individuals who will have no job security— to cross a picket line and thereby acquire the unlovely sobriquet of scab. The principle is firmly established in the analogous area of economic strikes. "[A]n employer, guilty of no act denounced by the statute, has [not] lost the right to protect and continue his business by supplying places left vacant by strikers. . . . The assurance by

respondent to those who accepted employment during the strike that if they so desired their places might be permanent was not an unfair labor practice. . . ." *NLRB v. Mackay Radio & Tel. Co.,* 304 U.S. 333, 345–46, 58 S.Ct. 904, 910–911, 82 L.Ed. 1381 (1938).

In fact the Board found fault in only two respects with BFI's response to the drivers' refusal to cross the picket line. The Board did not think that BFI needed to hire permanent replacements after it found out it would not need six trucks to fill International Harvester's order; and it thought that BFI had discharged the two drivers rather than merely replacing them permanently, though permanent replacement would have met the company's legitimate needs just as well.

■ But neither of these grounds for thinking that BFI went too far is supported by substantial evidence on the record as a whole. On February 15, just a few days before it received the six-truck order that was later cancelled, BFI had filled an order from International Harvester requiring four trucks to fill. The order of February 19 that would have required six trucks was cancelled but BFI could reasonably anticipate receiving such an order in the future that would not be cancelled. Had BFI, while the strike was still on, received an order from International Harvester requiring only five trucks to fill, it would not have been able to fill the order; it had only four drivers who were willing to cross the picket line. Moreover, it could not be sure that all four would be available for work every day—and if one was sick, and International Harvester required four trucks, as it had a few days before, BFI would not be able to fill the order. BFI could of course have used management personnel to drive the trucks, as it had done once before when the other drivers had balked at crossing the picket line, but a company is not required to use its managers to do work that its hourly employees refuse to do for reasons that though honorable are not the company's fault. BFI was entitled to hire permanent replacements to give itself flexibility in coping with fluctuations in a valued customer's demands and in its capacity to supply those demands.

■ It could not lawfully go further and discharge, as distinct from permanently replacing, the balking drivers. Discharge severs the employment relationship entirely; should the discharged worker apply for reemployment he would have to take his turn in the queue with any other applicants. In contrast, a worker who has been permanently replaced jumps to the head of the queue; in addition, he is entitled to notice of job openings; most important, he retains his seniority. If an employer can protect the reasonable needs of his business by permanently replacing a worker he has no right to go further and discharge him. That would unnecessarily burden the exercise of section 7 rights.

■ But we do not think BFI discharged these two drivers. It told them they were permanently replaced but also that if they made an unconditional offer to return to work they would be rehired when a job opened up. They did not make such an offer. The Board overlooked this undisputed fact when it held that because BFI had not notified them of job openings it must have discharged them despite the language of permanent replacement which it used. The duty to notify of a job opening arises only when the worker has made it clear that he will return to work "unconditionally"—that is, without insisting on the condition that led to his replacement—as soon as a suitable job opening appears. See, e.g., *Indiana Ready Mix Corp.,* 141 N.L.R.B. 651 (1963). Here that would mean agreeing to cross picket lines at premises of BFI's customers if necessary to enable BFI to fill those customers' orders. Since the drivers did not make any such offer there is no basis for taking the company's statement that it was permanently replacing rather than discharging them other than at face value. Therefore BFI was not guilty of an unfair labor practice under section 8(a)(1) and enforcement of the Board's order must be

DENIED.

COFFEY, Circuit Judge, concurring.

While I concur in the result reached by the majority, I disagree with the majority's conclusion that the National Labor Relations Act affords protection to a non-unionized employee's refusal to cross a picket line maintained against a third-party employer with whom that employee has no dispute. The cases which allegedly support the proposition that such a refusal is protected fail to articulate reasons which compel such a result. I agree with an author's description of the case law as standing in "disarray." Gorman, *Labor Law* at 324 (1976). It has also been noted that "[c]onspicuous by its absence in all the NLRB cases dealing with refusals, however, has been any thoughtful analysis of the policy considerations and alternatives involved or any attempt to weigh the opposing interests." *Carney and Florsheim, The Treatment of Refusals to Cross Picket Lines: "By-Paths and Indirect Crookt Ways",* 55 Cornell L.Rev. 940, 968 (1970).

In considering whether the BFI employees' refusal to cross the International Harvester picket line was protected activity under the Act, this court should now begin to give adequate weight to the interest of employers, thereby fostering equality between employers and employees and promoting industrial harmony. Based on a careful weighing of the opposing interests of employers and employees in this fact situation, I believe that the BFI employees' refusal to cross the International Harvester picket line is not entitled to the protection of the Act because any benefit accruing to the BFI employees would be at best remote, and the interest of the employer [BFI] to operate its business without unnecessary interruption clearly outweighs the employees' remote interests.

Assuming that the refusal is "concerted" activity within the meaning of the Act, such activity achieves protected status under the Act only if it is for either collective bargaining, mutual aid, or protection. 29 U.S.C. § 157. Clearly, the purpose of the refusal here was not related to collective bargaining as the BFI drivers were not unionized. Nor do I see how the refusal allowed the BFI drivers to achieve any degree of protection for themselves as workers. Thus, the refusal can be "protected" activity in this situation only if it is for the "mutual aid" of both the striking International Harvester workers and the BFI drivers.

The actions of the BFI drivers clearly aided the striking International Harvester workers in their cause as the normal operations of International Harvester were somewhat disrupted by the drivers' refusal to remove chemical wastes. Even if their refusal to pick up the wastes did not disrupt International Harvester's operations, it was an unequivocal showing of support for the cause of the striking workers which helped strengthen the International Harvester employees' position. But to become "mutual aid", the BFI employees' refusal to cross the picket line must in some way be intended to reciprocally benefit the BFI employees. *See generally,* Haggard, *Picket Line Observance as a Protected Concerted Activity,* 53 N.C.L.Rev. 43 (1974). The record on appeal, however, is devoid of any factual finding as to the existence of a reciprocal benefit which the BFI employees hoped to secure for themselves by refusing to cross the International Harvester picket line. Nevertheless, the majority speculates that the employees: (1) "*may* have felt that strengthening the union movement by honoring a union's picket line would promote their own economic interests"; (2) "*may* have hoped to become [union] members—hoped that a union victory at the International Harvester plant would encourage a successful organizing effort at their own plant"; or (3) may have believed that a victory for the International Harvester strikers would put pressure on BFI to increase the wages of its employees. These three "possibilities" are, as the majority concedes, no more than mere "hypotheses." Our role as an appellate court is not to hypothesize as to what the BFI drivers hoped to achieve through refusing to cross the International Harvester picket line, but rather to decide the case on the basis of facts in the record. *Neu v. Grant,* 548 F.2d 281 (10th Cir.1977). Based on the facts in the record, I am unable to ascertain how

the BFI employees' refusal to cross the International Harvester picket line was for the "mutual aid" of both the striking International Harvester workers and the BFI drivers.

Several reasons militate against a conclusion that the refusal to cross the picket line in this case is "protected" activity because of the BFI employees' vague belief that by so doing they were "promoting their own interests as workers." First, it defies logic to believe that the strike at International Harvester would provide any real long-term economic benefit to the BFI drivers. *See* Haggard, *supra,* at 94–98. The notion that all workers benefit as a class if a sub-class obtains higher wages or better working conditions fails to provide a sufficient basis for a finding of "*mutual* aid." "Working class solidarity is at best a political slogan, not a viable economic theory." *Id.* at 98. Second, allowing, and in so doing encouraging, such activity is contrary to an express policy against the spread of labor disputes. *See* H.R.Rep. No. 245, 80th Cong., 1st Sess. (1947) in 1 Legislative History of the Labor Management Relations Act, 1947 at 292 (1948). Finally, on balance, the interests of the employer in maintaining efficiency, avoiding lost time and reducing the risks of losing a valuable contract outweigh any remote interest which might accrue to the employees here. BFI was not a party to the controversy between International Harvester and its employees, but was rather merely going about its business in servicing its customers. BFI's business should not be made a victim of the International Harvester labor dispute.

The Supreme Court has recognized "that some concerted activity bears a less immediate relationship to employees' interests as employees than other such activity ... [and] that at some point the relationship becomes so attenuated that an activity cannot fairly be deemed to come within the 'mutual aid or protection' clause." *Eastex, Inc. v. NLRB,* 437 U.S. 556, 567–568, 98 S.Ct. 2505, 2513, 57 L.Ed.2d 428 (1978).[1] The refusal to cross the picket line by non-union workers of a third-party employer in the name of "solidarity", hoping to improve their status as workers, represents nothing more than an attenuated relationship unworthy of protection under § 7 of the Act. I recognize that in some narrowly drawn situations, there may·be a real economic benefit inuring to the employee who refuses to cross a picket line directed at other than his or her employer. However, in such a situation, the employee must be required to prove that he had good reason to believe that he would gain such a real economic benefit. *See* Haggard, *supra,* at 99.

In summary, I believe the Board, by finding that the BFI drivers were engaged in protected activity when refusing to cross the International Harvester picket line, has unfairly tipped the scales of justice against the legitimate interests of employers in efficiently operating their businesses. Accordingly, I would strike a proper balance between the interests of employers and employees, and hold that the Act afforded no protection to the two non-unionized BFI employees when refusing to cross the International Harvester picket line.

---

1. While this case upheld the distribution within an organized plant of a union newsletter addressing topics not directly affecting the plant's employees, there was no disruption of or refusal to engage in the employer's business as in the present case.