**BUSINESS SERVICES BY MANPOW-ER, INC., Petitioner, Cross-Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross-Petitioner.**

Nos. 434, 572, Dockets 84-4168, 84-4190.

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1985.

Decided Feb. 24, 1986.

Edward Sarzynski, Binghamton, N.Y. (Hogan & Sarzynski, Binghamton, N.Y., of counsel), for petitioner, cross-respondent.

Andrew F. Tranovich, N.L.R.B., Washington, D.C. (John F. Welsh, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent, cross-petitioner.

Lawrence M. Cohen, Martin K. Denis, Chicago, Ill. (Fox and Grove, Chartered, Chicago, Ill., Stephen A. Bokat, Nat. Chamber Litigation Center, Washington, D.C., of counsel), for amicus Chamber of Commerce of the U.S.

Before FRIENDLY, CARDAMONE and WINTER, Circuit Judges.

FRIENDLY, Circuit Judge:

This petition for review and cross-application for enforcement of an order of a divided panel of the National Labor Relations Board (the Board), 272 N.L.R.B. 827

(1984), raises close questions with respect to the application of the National Labor Relations Act to a case where employees honor stranger picket lines without adequate advance notice to their employer.

### The Facts and the Proceedings before the Board

The facts, as developed at a hearing before an Administrative Law Judge (ALJ), on the General Counsel's complaint charging a violation of § 8(a)(1) of the National Labor Relations Act, are as follows: Petitioner, Business Services by Manpower, Inc. (Manpower), is in the business of furnishing employees to businesses requiring industrial and clerical help on a temporary basis. It does this by maintaining a pool of individuals who have notified it that they would be available to accept temporary assignments on short notice. Kathy Taylor, who was in charge of Manpower's office in Binghamton, New York, at the time of the incidents here in question, testified:

> Punctuality and dependability are an absolute must because obviously we're supplying a service to a business, a company that needs the help. And if we can't depend on our company, therefore, the company cannot depend on us, therefore, we lose the account.

In order that its employees should realize the importance of these considerations, Manpower distributed a two-page policy statement to its employees at the time of their enlistment. First on the list of the employee's responsibilities was the following:

CALL IF YOU CAN'T REPORT OR IF YOU WILL BE LATE

> If you can't report for work, you MUST phone us early. This is very important!!! As your employer, it is necessary that you keep us informed.

Included at the close of the statement, under the heading "IMPORTANT," was the following warning:

IF YOU DO NOT REPORT AS SCHEDULED AND HAVE NOT CALLED OUR MANPOWER OFFICE, YOU HAVE RESIGNED.

These policies were also stressed in the initial interviews with new employees.

The practice was for employees desiring an assignment to call Manpower's office in Binghamton to check for job assignments and confirm their availability and for Manpower to call them during the day if an assignment developed. Between 5 P.M. and 8 A.M. communication could be had only through an answering service.

Richard Cordes had worked for Manpower in 1979 and, after a period when he was in school, had his file reactivated and began receiving assignments early in 1981. Craig Monroe started working for Manpower on April 15, 1981, and worked approximately two days a week during the five weeks of his employment until the events here in issue. The men lived in the same rooming house and, whenever possible, requested the same work assignment so that they could ride together to the customer's premises. Neither was a union member.

One of Manpower's largest accounts was Spaulding Bakery (Spaulding), which had a plant in Conklin, New York, near Binghamton. On May 20, 1981, Monroe received a call from Esther Nui of Manpower stating that she had a two-day assignment for him and Cordes at the Spaulding plant, starting at 9 P.M. on May 21; Monroe accepted on behalf of both.

Cordes and Monroe arrived at the plant around 8:30 P.M. on May 21. They observed five or six individuals carrying or wearing picket signs advertising a labor dispute between Spaulding and the Bakery and Confectionery Workers Union.[1] The picketers made no attempt to block cars from entering the plant, and neither the signs nor the men carrying them requested anyone to refrain from doing so. Cordes and Monroe stopped to talk with the picketers and learned that there was a labor

---

1. At the hearing before the ALJ, Manpower disputed that picketing was still going on at 8:30 P.M. and claimed that Cordes' and Monroe's story was fabricated. No claim is made before this court that the contrary determination of the ALJ was not supported by substantial evidence.

dispute at Spaulding's plant at Hazelton, Pennsylvania, over 100 miles away, resulting in a strike, and that the picketers claimed that Spaulding had moved to Conklin some of the work previously performed at Hazelton. Although they were not asked to do so, and although Cordes "could well believe" he had been told that if he did not report as scheduled and had not called Manpower's office, he would be considered as having resigned, Cordes and Monroe immediately made up their minds not to "cross" the picket line and to drive back to Binghamton.

The men drove into town and stopped at a grocery store, from which Cordes called Manpower's answering service. He claimed he told the service that they had come upon the picket line, of which they had not been previously informed, and that they could not cross it in good conscience, but that they were available for future assignments that night or the next day. He further claimed that the answering service operator identified herself as such, said she couldn't give out assignments, and agreed to pass on the message. The person who received the call did not testify, and her note of the call was not produced. However, the ALJ allowed Kathy Taylor to testify that the note said merely:

> 5/20/81, 8:55 P.M. Rick Cordes with a phone number, available the next few days.

Taylor asserted that whatever Cordes may or may not have said to the answering service, she then knew only that Cordes and Monroe had not appeared, as she learned on the following morning on a visit to the Spaulding plant and also from the information contained in the note of the answering service.

Over the next two and a half weeks Cordes and Monroe made frequent calls to Manpower, mostly in the evening, reporting their availability but without result in the form of job assignments. They could not recall to whom they had spoken or exactly what was said, but neither made any mention of the incident involving the picket lines or otherwise informed Manpower of their attitude toward picket lines or that this was the reason for their failure to show up for work on May 21. When Monroe called on June 10, Esther Nui answered. After Monroe reported his availability, Nui replied, "Well, Craig, I have to inform you that we have you listed as having resigned." When Monroe said he had never resigned, Nui answered, "On the last assignment that we sent you and Rick on, you didn't report for work and you didn't inform us." Monroe replied, "Esther, we did inform you as soon as we got there and saw there was a picket line. We called the answering service as soon as we got there and saw there was a picket line. We called the answering service as soon as we could get to a phone." After a pause, Nui said, "Well, Craig, I'm sure you have your principles. But I'm afraid you're going to have to remain listed as having resigned." [2]

The next day, June 11, Cordes called Manpower and also got Esther Nui. He said, "I understand that Craig and I have been fired," to which Nui responded, "No, we hadn't been fired, that we had resigned." Nui admitted that she knew of the men's repeated phone calls seeking assignments. She said at first that Cordes and Monroe were treated as having resigned because of the picket line but, when Cordes said they had not been informed there would be a picket line, said that the dismissal didn't have anything to do with the picket line but resulted from the men's failure to call sufficiently in advance of the starting time for the assignment.[3]

> Well, you have your principles. Well, you didn't want to cross the picket line. But you are not being rehired by Manpower because of that reason. You are not being rehired by Manpower because you had failed to follow our procedure.

---

**2.** This is Monroe's version. Nui did not contradict it but emphasized that this was the first occasion on which she knew about the role of the picket line.

**3.** This is Cordes' version. Nui's is not essentially different, although she summarized the conversation as follows:

Accepting as credible all the testimony except Manpower's assertion that there was no picket line as late as 8:30 P.M. on May 21, the ALJ found that in refusing to cross the picket line Cordes and Monroe were exercising a right protected by § 7 and that Manpower violated § 8(a)(1) of the National Labor Relations Act[4] by dismissing them because of their exercise of their § 7 rights. He also held that the violation occurred on May 22, 1981, when Cordes and Monroe were first placed in the status of having resigned, even though there was no evidence that anyone in the company other than the answering service knew that refusal to cross a picket line had been a part of the stream of events. Accordingly, he recommended, in standard language, that Cordes and Monroe be reinstated to their former jobs or, if these no longer existed, to substantially equivalent positions of employment, and that Manpower should make them whole for any loss of wages or other benefits as a result of their termination.

Manpower filed exceptions which were heard by a three-member panel of the Board. Members Zimmerman and Dennis joined in an opinion sustaining the ALJ. 272 N.L.R.B. 827 (1984). They held that the refusal to cross the picket line was within the "mutual aid or protection" clause of § 7, citing *Eastex, Inc. v. NLRB*, 437 U.S. 556, 564–65, 98 S.Ct. 2505, 2511–12, 57 L.Ed.2d 428 (1978); *NLRB v. Southern California Edison Co.*, 646 F.2d 1352, 1363–64 (9 Cir.1981); and *NLRB v. Browning-Ferris Industries, Chemical Services, Inc.*, 700 F.2d 385, 387 (7 Cir.1983). They rejected Manpower's business necessity defense, holding that removal of Cordes and Monroe from Manpower's referral list was equivalent to a discharge and that, on the analogy of economic strikers, an employer may not discharge employees who refuse to cross lawful picket lines. Recognizing that Manpower "to protect its business interests, could lawfully have refrained from referring Cordes and Monroe to Spaulding or to any other company known to be involved in a labor dispute," 272 N.L.R.B. at 828, they held that Manpower violated the Act by discharging them. The majority rejected any balancing of employer and employee interests that would result in a finding that the discharges here were lawful, as the dissent urged, stating that "it is difficult to envision circumstances in which the dissent's balancing test would result in a decision favorable to employees. The balancing test thus effectively renders nonexistent an essential Section 7 employee protection." *Id.*

Chairman Dotson delivered a strong dissent. *Id.* at 829–31. He agreed with the majority that the conduct was protected concerted activity within the meaning of § 7, but argued that under a balancing of the employees' interest in engaging in the conduct at issue here and the employer's interest in assuring the reliable performance of work assignments, the discharges were justified. He stressed that the refusal was not to cross a picket line at the premises of the employees' own employer but at those of a customer of the employer, and that this interest was "highly attenuated," especially in light of the fact that the pickets were informational only and did not even seek to bar entry into the plant. In this type of case the Board

4. These provide:
§ [7]. **Right of employees as to organization, collective bargaining, etc.**
Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection, and shall also have the right to refrain from any or all of such activities except to the extent that such right may be affected by an agreement requiring membership in a labor organization as a condition of employment as authorized in [§ 8(a)(3).]
29 U.S.C. § 157.
§ [8]. **Unfair labor practices**
(a) **Unfair labor practices by employer**
It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in [§ 7.]
29 U.S.C. § 158(a)(1).

must weigh the employee's less compelling interest in expressing support for picketers at another company against the employer's interest in the employee's job performance.

*Id.* at 831. He emphasized Manpower's particular necessities in its employees' reliable reporting to work. Manpower, he believed,

> could not risk maintaining Cordes and Monroe on its referral list because they had demonstrated that in the event of a picketing situation they could not be relied on to report to work.

*Id.* Concluding, he thought that, under the peculiar facts of this case, involving a temporary employment agency which cannot, in a literal sense, "permanently replace" individuals it refers for employment because its assignments are not permanent, Manpower's conduct was still more nearly akin to permanent replacement, which the Board allows in the case of employees failing to report because of refusal to cross a picket line, than to discharge. *Id.*

## DISCUSSION

The Board's treatment of honoring "stranger" picketing, i.e., refusal of employees of one employer to cross a picket line of employees of another in the course of their employment, usually with nothing in common with the picketing employees other than a general interest in "worker solidarity," which both parties concede this case to be, has wavered over the years. So has that of the courts; as Professor Gorman has noted, "the cases stand ... in disarray." Gorman, *Labor Law* 324 (1976).

The decision usually cited as the first to address directly the question of stranger picketing was *Cyril de Cordova & Bro.*, 91 N.L.R.B. 1121 (1950). The Board there approved the trial examiner's finding that § 8(a)(1) protected an employee of a stock brokerage firm, who was a union member, from being discharged for his refusal to cross a picket line established at a stock exchange by the same union out of sympathy with the striking employees. Adopting an approach quite close to the one now

followed by the Board, the trial examiner rejected the contention that the employer's conduct was insulated from being an unfair labor practice under § 8(a)(1) because of the employer's lack of anti-union animus, *id.* at 1134–35, rejected the analogy to partial or intermittent strikers, whom employers are permitted to discharge outright, *id.* at 1135–36, analogized the employee instead to an economic striker with the same rights as the strikers whose picket line he respected, and held that the employer's remedy was limited to treating the employee as an economic striker and permanently replacing him subject to the right of reinstatement in the event of an opening when he chose to return, *id.* at 1137–38.

The next case to address the question was *Rockaway News Supply Co.*, 95 N.L.R.B. 336 (1951), *enf. denied*, 197 F.2d 111 (2 Cir.1952), *aff'd on other grounds*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953). The Board held that the discharge of Waugh, a truck driver, for refusing to cross a picket line to make his regular pickup at a struck newspaper violated § 8(a)(1). It cited *Cyril de Cordova* and rejected as not "determinative" a distinction between the two cases based on the refusing employee's lack of common union membership with the striking employees. 95 N.L.R.B. at 337–38. The Board recognized that although Waugh's refusal to cross the picket line was a protected activity, Rockaway News could have required him "to elect whether to perform all his duties or, as a striker, to vacate his job and make way for his replacement," *id.* at 337; however, Rockaway News could not discharge him. This court accepted the Board's conclusion that the activity was protected concerted activity within the meaning of § 7, 197 F.2d at 113 (citing *NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505–06 (2 Cir. 1942)), but nevertheless denied enforcement on the ground that the employee's protection from reprisal by his employer for engaging in that activity was defined by analogy to *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 65 S.Ct. 982, 89 L.Ed. 1372 (1945) (solicitation of union member-

ship within plant is protected activity but employer's interest in efficient performance of work permits prohibition, on pain of discharge, of such activity during working hours). Accordingly, the employee was bound to follow the employer's rules and cross the picket line if necessary when his work assignment required it, and the employer was entitled to discharge the employee for violating the rule. 197 F.2d at 113–14.[5] We also disapproved the distinction sought to be made by the Board "between the discharge of Waugh for refusing to carry his newspapers across the picket line, which it stamps as unlawful, and the suggested replacement of him as a striker after he had been compelled to vacate his job for refusing to do so, which it thinks would have been perfectly all right." *Id.* at 115.

The Supreme Court upheld the denial of enforcement but on a different ground. This was that an arbitration award in favor of the employer, based upon a no-strike clause in the collective bargaining agreement, was valid and covered the situation there involved. 345 U.S. at 75–81, 73 S.Ct. at 522–25. Before deciding that issue, however, the Court delivered extensive dicta, denigrating the Board's replacement-discharge distinction,[6] as this court had done, and stating that "[t]his application of the distinction is not sanctioned by *Labor Board v. Mackay [Radio & Tel.] Co.*, 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381 [ (1938) ]." [7]

Shortly after *Rockaway News*, a differently constituted Board switched positions and held that a deliveryman was properly discharged for refusing to cross a picket line at certain customers' premises, even though he was a member of the same union as the striking employees, stating that the employee's "conduct was a refusal to do the job for which he had been hired and a direct disregard of his employer's instructions," *Auto Parts Co.*, 107 N.L.R.B. 242, 243 (1953), although the Board declined to comment on whether the conduct was protected activity under § 7 or not. The Board adhered to this position during the remainder of the Eisenhower Administration. With another change in administration, the Board began an evolutionary process of returning to the approach of *Cyril de Cordova, supra,* with its decision in *Redwing Carriers, Inc. (Redwing II)*, 137 N.L.R.B. 1545 (1962), *petition to review denied*, 325 F.2d 1011 (D.C.Cir.1963), *cert. denied*, 377 U.S. 905, 84 S.Ct. 1165, 12 L.Ed.2d 176 (1964).

In *Redwing Carriers*, the employer had discharged certain employees for refusing to cross a picket line at a customer's premises in order to make deliveries, and within a day or two the employees were replaced with others who were willing to make the deliveries. After the Board had initially held the activity to be unprotected under § 7, following the rationale of *Auto Parts Co., see Redwing Carriers, Inc. (Redwing I)*, 130 N.L.R.B. 1208 (1961), and after a change in the membership of the Board

5. This court's limitation of the right to honor stranger picket lines to nonworking hours seems never to have been followed. We regard it as having died from desuetude, although it has never been expressly overruled.

6. The Court of Appeals said, "We cannot follow the Board's reasoning." Nor can we. The distinction between discharge and replacement in this context seems to us as unrealistic and unfounded in law as the Court of Appeals found it. This application of the distinction is not sanctioned by *Labor Board v. Mackay Co.*, 304 U.S. 333, 347, 58 S.Ct. 904, 911, 82 L.Ed. 1381. It is not based on any difference in effect upon the employee. And there is no finding that he was not replaced either by a new employee or by transfer of duties to some nonobjecting employee, as would appear necessary if the respondent were to maintain the operation. Substantive rights and duties in the field of labor-management do not depend on verbal ritual reminiscent of medieval real property law. 345 U.S. at 75, 73 S.Ct. at 522.

7. In *Mackay Radio*, the Court had held that striking employees remained statutory "employees" under § 2(3) of the Act, and that an employer was free to replace striking employees and assure their replacements of continued employment, although it could not discriminate among employees on the basis of union activity in reinstating them after the strike.

under President Kennedy, it reconsidered its initial decision. While upholding the result that had been reached, it altered the rationale dramatically. The Board solidly affirmed the protected nature of the refusal to cross a stranger picket line under § 7. 137 N.L.R.B. at 1546–47. On the other hand, it took up the remarks of the Supreme Court and of this court in *Rockaway News* as to the unreality of the distinction between permanent replacement and discharge, stating that

> where it is clear from the record that the employer acted only to preserve efficient operation of his business, and terminated the services of the employees only so it could immediately or within a short period thereafter replace them with others willing to perform the scheduled work, we can see no reason for reaching different results solely on the basis of the precise words, i.e., replacement or discharge, used by the employer, or the chronological order in which the employer terminated and replaced the employees in question.

*Id.* at 1547. Thus, the Board returned to the rule of *Cyril de Cordova* that respecting stranger picket lines fell within § 7, but, by upholding its determination in *Redwing I* that the employer had engaged in no unfair labor practice by discharging the employees, implied that "business justifications" would be given broad effect in this context, at least absent any evidence of anti-union animus, and appeared to heed the Supreme Court's warning in *Rockaway News* against a formalistic application of the replacement-discharge distinction. The D.C. Circuit denied the employees' petition to set aside the Board's order, 325 F.2d 1011, with a citation to this court's decision in *Rockaway News*, but with no comment on the merits of the Board's new approach.

The next major case was *L.G. Everist, Inc.*, 142 N.L.R.B. 193 (1963), *enf. denied*, 334 F.2d 312 (8 Cir.1964), in which several truck drivers were discharged for their refusal to cross a picket line to make deliveries to a construction site. The Board held that since the employees had made unconditional offers to return to work before any replacements had been obtained for them, the discharges were contrary to the rule of *Redwing II*, which adopted the rules ordinarily applicable to economic strikers, and accordingly it was a violation of § 8(a)(1) to deny reinstatement to the employees. The Eighth Circuit resoundingly denied enforcement. First, the court emphasized the importance of uninterrupted deliveries to the employer's business. 334 F.2d at 315. Thus, the discharges " 'were prompted by [the employer's] need to continue operations and were not in reprisal for the [refusal] to cross the picket line.' " *Id.* at 315–16 (quoting the trial examiner's opinion). The court then rejected the Board's reliance on the analogy to situations involving economic strikers, citing the Supreme Court's opinion in *Rockaway News* for the proposition that the replacement-discharge distinction was immaterial in this context. *Id.* at 316–17. The court then held that refusal to cross the picket line under these circumstances constituted a "violation of the ordinary and implied obligations of employment," and hence amounted to justifiable "cause" for the dismissal, as was the case with the express contractual ban on striking at issue in the Supreme Court's opinion in *Rockaway News*, and distinguished away situations in which the discharge is motivated by anti-union animus, or where the employees share common union membership with the strikers, or where the refusing employees are also employees of the struck employer. *Id.* at 317. In effect, the court's decision in *L.G. Everist* was not just a rejection of the Board's application of the *Mackay Radio* principle in this particular situation, but amounted to a complete rejection of the underlying premise of the *Redwing II* decision and the analogy to economic strikers. Business justification in this context went beyond simply allowing the employer to take whatever actions were necessary to get the work done at the picketed location, but included allowing the employer to discharge employees who had shown their unwillingness to do the *work when it was*

required and thus could not be relied upon in similar situations in the future.

Undaunted by the denial of enforcement in *L.G. Everist*, the Board, in *Overnite Transportation Co. (Overnite Transportation I)*, 154 N.L.R.B. 1271 (1965), *enf'd in part*, 364 F.2d 682 (D.C.Cir.1966), continued its strict application of the analogy to economic strikers, with limited room for the employer to react to refusals to cross stranger picket lines. There the Board found the employer, a freight pick-up-and-delivery service, to be in violation of §§ 8(a)(1) and 8(a)(3) for discharging a truck driver who refused to make a delivery to a picketed plant. After the employee had informed the employer of the reason for his refusal, another employee was immediately sent over to make the delivery and quickly did so without incident. Thereafter, the employer dismissed the first employee, citing his refusal to follow orders and stating that as a matter of policy " 'we didn't honor pickets anywhere.' " 154 N.L.R.B. at 1273. The employee was not permanently replaced by any other employee. In finding a violation of the Act, the Board emphasized that an overriding business justification requires more than "a mere showing that someone else may have to do the work." *Id.* at 1274. Here no disruption was caused by having the dispatcher immediately send out someone else to make the delivery, and the Board emphasized that there was no showing that the employee's "conduct rendered him incapable of performing his job or that it disrupted the [employer's] business in any significant respect." *Id.* at 1275. In granting enforcement to the Board's order, the D.C. Circuit again refused to go into the merits of the § 8(a)(1) question, finding that there was sufficient basis to support the Board's order under § 8(a)(3) "in light of [the employer's] other anti-union actions and the frailty of the asserted business justification for the discharge." 364 F.2d at 684.

The shifting nature of the Board's approach to refusals to cross stranger picket lines is demonstrated by *Thurston Motor Lines, Inc.*, 166 N.L.R.B. 862 (1967). There the Board found no § 8(a)(1) violation in the employer's outright discharge of an employee truck driver who refused to make a delivery across a picket line during the course of his regular delivery schedule. The employer had sought to accommodatet the employee's desire not to cross the picket line by attempting a number of courses short of sending a temporary substitute for that delivery alone, including delaying the delivery for over a week. However, the decision is out of line with the Board's approach in *Overnite Transportation I, supra*, and subsequent cases, because although the delivery might have been considered urgent in light of the fact that the ICC had called the employer and ordered it, as a common carrier, to make the delivery immediately, it appears that a supervisor or other employee could easily have been sent to make the delivery in the employee's stead. Nevertheless, the Board adopted the trial examiner's finding that the employer's "interest in maintaining its normal business operations clearly overrode Jackson's refusal to do a part of his regularly assigned work," even though the consignee "was not a customer with whom [the employer] did a substantial amount of business." *Id.* at 866. It was "enough to find ... that [the employer's] right to operate, either in fact or in its reasonable estimation, was in jeopardy." *Id.* Notably the trial examiner emphasized that the employee had *not* unconditionally applied for reinstatement by the time he was discharged, *id.* at 865 n. 11, and he did hold it to be a violation of § 8(a)(1) for the employer to discharge a second employee who was asked, and refused, to make the delivery in place of the first, noting that the assignment was not in the regular course of that employee's own duties and that the discharge took place after the delivery had been made. *Id.* at 866. *See also Overnite Transportation Co. (Overnite Transportation II)*, 209 N.L.R.B. 691 (1974) (reversing trial examiner's finding of § 8(a)(1) violation, following *Thurston* analysis).

With the important exception of the *Thurston* and *Overnite Transportation II* cases, which seemed to recognize that the

concept of "business justification" must be broader than the simple need to perform the immediate task that is barred by the picket line, the Board after *Overnite Transportation I* refused to alter its approach to recognize the apparent discomfort in the courts of appeals with its strict approach to stranger picket line situations. The only major development since then was its decision in *Torrington Construction Co.*, 235 N.L.R.B. 1540 (1978), in which it appears to have narrowed the business justification exception even further. There the employer had discharged two employees for repeatedly refusing to cross a secondary, informational picket line at a construction site to deliver concrete, and each was immediately replaced. Although *Redwing II* appeared to allow room for the employer to discharge employees who refused to cross picket lines so long as they were immediately replaced, and so long as they were rehired in the event they made unconditional offers to return and a job was available, the Board in *Torrington* signalled a return to the strict replacement-discharge distinction that had preceded *Rockaway News:* "While the employee may be replaced if the evidence clearly discloses that the sole purpose was the continued efficient operation of the business, such employee may not be discharged." 235 N.L.R.B. at 1541. The Board did not explain the inconsistency between this approach and the Supreme Court's dictum in *Rockaway News* rejecting the replacement-discharge distinction. The Board's approach, which was applied in Manpower's case, appears not to allow any room for discharge even where the asserted business justification is that the employee has shown himself not to be dependable in a situation where his refusal to cross a picket line cannot be accommodated by the employer without injury to the employer's business.

At least until 1978, the courts of appeals continued to be unwilling to approve this sweeping approach. In *NLRB v. William S. Carroll, Inc.*, 578 F.2d 1 (1 Cir.1978), the court denied enforcement of a Board order based on a finding of a § 8(a)(1) violation where the employer, an operator of a charter bus service, dismissed an employee who, on his first day of work, refused to cross a picket line with a bus full of passengers after reluctantly accepting the assignment. The court emphasized that "[w]hether or not the Act has been violated depends on a case by case balancing of the right of the employee to express his union sympathies and the right of the employer to conduct his business," *id.* at 3, and emphasized that the employee's conduct here showed him to be sufficiently undependable to justify outright dismissal, *id.* at 5. The court also strongly rejected the Board's placement of the ultimate burden of justifying the discharge on the employer in a situation in which no anti-union animus had been shown and after "the employer has demonstrated a legitimate business reason for the dismissal." *Id.* at 3-4.

Even where the courts upheld the Board prior to 1978, they were cautious. In *Swain and Morris Construction Co.*, 168 N.L.R.B. 1064 (1967), *enf'd*, 431 F.2d 861 (9 Cir.1970), the Board found a § 8(a)(1) violation where several employees were discharged for refusing to cross a picket line to do a job at a construction site in a situation in which there was no one else available to do the work and the job could not be completed for two weeks in the face of a demand by the customer that the job be done immediately. While the Ninth Circuit granted enforcement, it did so on the basis that "[t]he Board could fairly conclude that the only real reason for the discharge was to make an example of the employees involved," and "[t]he Board also had reason to find that the work at [the construction site] was not of such importance that its immediate completion was necessary for the continuing and orderly operation of [the employer's] business." 431 F.2d at 863. In *Teamsters Local 657 v. NLRB*, 429 F.2d 204 (D.C.Cir.1970) (per curiam), the court granted enforcement to the Board's order finding a violation of § 8(a)(1) for discharging an employee who refused to cross a picket line, but emphasized that "[s]ubstantial evidence supports

the Board's conclusion that the company's purpose in discharging the employee was not to continue the efficient operation of its business, but to punish him for his union activities," *id.* at 205. In *NLRB v. Alamo Express, Inc.,* 430 F.2d 1032 (5 Cir.1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 683 (1971), the court granted enforcement to the Board's order finding a violation of § 8(a)(1) for discharging two truck drivers who refused to cross a picket line to make deliveries, but emphasized that the employer did not follow up this action by seeking to replace the employees with others, and did not show that this could not be done or that there was any difficulty in doing so:

> There was no evidence that the two men were eventually replaced by an employee willing to cross the picket line. Nor was the pickup or delivery to this particular site within a permanent route or special skill of either [of the two employees] such that no one would have been capable of replacing them.... It was a routine pickup which ... could have been performed by any of [the employer's] other employees....

*Id.* at 1036.

■ Common to all of the decisions in the courts of appeals until this point, and even to the Board's approach prior to *Torrington Construction,* was a recognition that the remedy of discharging an employee who had refused to cross a stranger picket line might be justified where strong, legitimate business interests were present, where the employee's § 7 interest in not crossing the picket line could not be accommodated without impairing those employer interests, and where it was clear that the decision was not motivated by anti-union animus. In nearly every case in which a § 8(a)(1) violation was found on the basis of such a discharge, the Board or the court of appeals emphasized that the refusal to cross the picket line did not risk injury to the employer's business because it was possible, for example, to have a temporary substitute perform the task without unacceptable delay, *see, e.g., Overnite Transportation I, supra; Swain and Morris*

*Construction Co., supra.* On the other hand, no § 8(a)(1) violation would be found where it was shown that the employee's refusal to cross, without adequate advance warning to the employer, risked injury to the employer's business or reputation, *see, e.g., William S. Carroll, Inc., supra; Redwing Carriers, Inc., supra.* As this court emphasized in *Rockaway News,* the determination of a violation of § 8(a)(1) depends on a balancing of the employer's interests against those of the employee, a balancing that must be performed on a case-by-case basis, *see William S. Carroll, Inc., supra,* 578 F.2d at 3, and not on a rigid, formalistic application of rules applicable in another context, to wit, economic strikes taking place on the employer's own premises, in which different concerns are implicated. These cases lend little support for the approach adopted by the Board in *Torrington Construction* and applied in this case, under which an employer is considered to have committed a per se violation of § 8(a)(1) whenever it discharges an employee who refuses to cross stranger picket lines, regardless of the circumstances of the individual case.

In justifying this substantial departure from prior law, the Board lays great—in our view, undue—stress on the Supreme Court's decision in 1978 in *Eastex, Inc. v. NLRB,* 437 U.S. 556, 98 S.Ct. 2505, 57 L.Ed.2d 428. The troublesome issue in *Eastex* was whether § 7 protected the right of employees to distribute in nonworking areas during nonworking time a union newsletter, one section of which called upon employees to support the union in opposing a proposal to incorporate a state's right-to-work law into its constitution and another section of which called for support in opposing a presidential veto of an increase in the federal minimum wage. The Court's affirmative answer to that question is of little relevance here; Manpower does not seriously dispute that, as we held in *Rockaway News* many years ago, § 7 encompasses the honoring of stranger picket lines. Once the Court had decided that the employees' § 7 rights had been implicated,

the question whether discharging the employees because of the exercise of protected activity violated § 8(a)(1) was rather easy, since, as Justice Powell pointed out, Eastex "made no attempt to show that its management interests would be prejudiced in any way by the exercise of § 7 rights proposed by its employees here" and the intrusion on property rights, if any, would not vary because of the nature of the material in the newsletter. *Id.* at 573, 98 S.Ct. at 2516. Here, on the contrary, the issue of the scope of the business justification principle is the crucial one. Although the distribution of the newsletter in *Eastex* had no effect on the conduct of the employer's business, the Board attaches great importance to a footnote, 437 U.S. at 564–65 n. 13, 98 S.Ct. at 2511–12, n. 13, where after saying in text that "the Board and the courts long have held that the 'mutual aid or protection' clause encompasses" "otherwise proper concerted activities [of employees] in support of employees of employers other than their own," Justice Powell cited, *inter alia,* the second *Redwing Carriers* decision, *supra,* 137 N.L.R.B. 1545, 1546–47, and *NLRB v. Alamo Express, Inc., supra,* 430 F.2d 1032, 1036.

The Board reads into the footnote more than it will bear. Insofar as *Redwing II* and *Alamo Express* held that respecting stranger picketing was an activity protected by § 7, we are in agreement with them. In fact, the statement in *Alamo Express* that such conduct was protected activity within the meaning of § 7 was followed by a single citation to our own opinion in *Rockaway News.* The issue here, however, concerns the balance between this § 7 right and the employer's right to operate its business efficiently—an issue not present in *Eastex.* The footnote cited *Redwing II* and *Alamo Express* for the former proposition only. Significantly, it concluded by stating:

> We express no opinion, however, as to the correctness of the particular balance struck between employees' exercise of § 7 rights and employers' legitimate interests in any of the above-cited cases.

Moreover, in *Redwing II,* the Board refused to find an unfair labor practice because the employees were discharged not out of anti-union animus or in reprisal but because the employer wanted to continue doing business with the stranger who had been struck.

We likewise do not find that decisions of the courts of appeals subsequent to *Eastex* with respect to the honoring of stranger picket lines constitute any significant departure from the earlier ones we have reviewed.

■ In *NLRB v. Southern California Edison Co.,* 646 F.2d 1352 (9 Cir.1981), the court upheld the Board's finding of a violation of § 8(a)(1) for suspending for five days an employee who refused to cross a picket line at a customer's premises, citing *Eastex, Inc. v. NLRB, supra,* 437 U.S. at 564, 98 S.Ct. at 2511, for its statement that "[i]t is the Board's responsibility in the first instance to decide whether [activity in support of employees of employers other than their own] is protected," and with little more to its analysis of the conduct at issue than the statement that "[t]he Board's interpretation of the Act to protect an employee who honors a lawful picket line at a customer's place of business is reasonably defensible," *id.* at 1364. In the facts of that case, there was no urgency in performing the work that was to be done on the customer's premises, the work was for the benefit of the employer rather than of the struck customer, and the employee had notified his supervisor at the beginning of the shift that he could not perform the work and pointed out another employee who would. *Id.* at 1361. Although *NLRB v. Browning-Ferris Industries, Chemical Services, Inc.,* 700 F.2d 385 (7 Cir.1983), endorsed the Board's position that recognition of stranger picketing is protected by § 7, as do we, one of Judge Posner's reasons was that "[s]uch treatment allows a more flexible comparison of the benefits to the workers and the burden to the employer.... Holding that [the conduct] is protected does not make it sacrosanct but does require the employer to demonstrate good

cause for suppression ...," *id.* at 388. In fact, the court denied enforcement on the ground that the employees had not made an unconditional offer to return to work, i.e., without insisting on the condition that led to their replacement, and thus the employer was under no obligation to reinstate them, *id.* at 389. The conclusion that we glean from all the court cases, after *Eastex* as well as before, is simply that an employer can take reasonable steps to deal with the honoring of stranger picketing where this adversely affects his business and that what is reasonable depends on the totality of the circumstances in each case.

■ This case presents a particularly extreme combination of "attenuation" of the protected right, of lack of causal relationship between the exercise of the right and the employer's disciplinary measures, and of need by the employer to enforce a neutral rule requiring advance reporting of inability or unwillingness to fulfill an agreed assignment.

The employees' § 7 interest in refusing to cross the picket line at the Spaulding plant was particularly weak. In the ordinary situation involving a stranger picket line, where the refusing employee shares neither the union affiliation nor the employer of the picketing employees, the employee's conduct is still considered to come squarely within the scope of the "mutual aid or protection" clause of § 7 on the theory that honoring the picket lines of other employees generally promotes worker solidarity and increases the possibility that the refusing employee will receive the benefit of similar support in the future. *See NLRB v. Peter Cailler Kohler Swiss Chocolates Co.*, 130 F.2d 503, 505–06 (2 Cir.1942). This rationale becomes strained, however, when, as here, the picket line is not only established by individuals who are not even employed at the picketed plant, but also is purely informational in nature. The picketing employees were not seeking

to bar access into the plant, either physically or by requesting anyone not to enter, and Cordes' and Monroe's refusal to cross the picket line did not even help to fulfill any immediate purpose behind the picket line.

On the opposite side of the balance is Manpower's compelling interest in the performance of work assignments, or in sufficient advance notice to permit timely replacement, and the complete lack of anti-union animus underlying the discharges that served to safeguard that interest. Manpower's business was the furnishing of temporary help, and Manpower had made abundantly clear to Cordes and Monroe their overriding responsibility to phone early if they could not report for work—for whatever reason—and the consequences that would ensue if they did not. Cordes and Monroe were terminated for failing to make a timely report of their unavailability for work, not for having honored a stranger picket line—something of which, as the ALJ determined in a finding not disturbed by the Board, the employees of Manpower responsible for their termination did not even know until three weeks later. The ALJ properly regarded the General Counsel's attempt to show a discriminatory application of the resignation rule as not even worthy of discussion.[8] The refusal to cross the picket line thus was simply a but-for cause of the termination, not a motivating one. The uncontradicted testimony of Kathy Taylor, whom the ALJ found to be a credible witness, was that another employee who did give advance notice of objection to working at the Spaulding plant because of the picketing was offered and accepted other assignments. Cordes and Monroe refused to pass pickets who were simply giving information about a strike at a different plant and had not even asked them to do this, without any regard for the interests of their employer and without notice

---

8. This consisted of testimony by Cordes and Monroe that no adverse consequences had been suffered on one occasion when Cordes arrived late after his car had broken down and on another in which Monroe did not arrive at all due to car trouble. However, on both occasions the men had given reasonable advance notice to Manpower. Both Taylor and Nui gave uncontradicted testimony to the strict and neutral application of the rule.

sufficient to permit their replacement. As a result of this refusal Manpower lost the profits it would have earned on their services and, more important, risked impairment of its reputation for reliability with one of its most important customers. Unlike the many cases discussed above in which replacement of the refusing employee could be achieved with little or no disruption in the employer's operations, or with only a harmless delay, such replacement was simply impossible here—the failure of Cordes and Monroe to show up on the night of May 21 meant that that business was lost forever. If under this combination of circumstances the position of the Board majority is not making the protected conduct "sacrosanct," to use Judge Posner's phrase, we do not know what would be.

The Board majority does not and could not well dispute that Manpower would have been entitled to fill the jobs that Cordes and Monroe left empty if it had been given an opportunity to do so. It says that Manpower could "permanently replace" Cordes and Monroe but not discharge them. In most cases, there is a distinction between the practical effect of these concepts, as Judge Posner elaborated in *Browning-Ferris, supra,* 700 F.2d at 389. But, apart from the effect of the Court's dictum in *Rockaway News, supra,* 345 U.S. at 75, 73 S.Ct. at 522, which the Court has never retracted, the concept of "permanent replacement" does not rest comfortably in the context of a temporary employee and a two-night assignment. As we read the Board's opinion, all that Manpower could lawfully do was to "replace" Cordes and Monroe for the remaining night of their assignment, assuming that this still remained open; despite their disregard of the warning given them on their employment, Cordes and Monroe were entitled, on the Board's theory, to be treated on a parity with other applicants for any new job that turned up. But once Cordes and Monroe had demonstrated their unreliability, it would be cold comfort to Manpower to know that in similar situations in the future it would be entitled to "replace" the employees, and only after the harm had already been done. In any event, an element of the "permanent replacement" doctrine is an unconditional offer to resume employment. *See NLRB v. Koenig Iron Works, Inc.,* 681 F.2d 130, 145 (2 Cir.1982); *Browning-Ferris, supra,* 700 F.2d at 389. Here Cordes and Monroe never offered that if a picket line theretofore unknown to them were to turn up at some other assignment, they would not again walk off the job without giving advance notice.

The Board, 272 N.L.R.B. at 828, seeks to analogize the case to that of economic strikers, *see NLRB v. Mackay Radio & Tel. Co., supra;* Manpower proffers the conflicting analogy of intermittent work stoppages, *see UAW Local 232 v. Wisconsin Employment Relations Board,* 336 U.S. 245, 255–58, 69 S.Ct. 516, 522–23, 93 L.Ed. 651 (1949). Neither analogy is exact. We prefer to deal with the case on its own terms and its unusual facts. In rejecting the Board's application of the analogy of economic strikers to this situation, we do not mean to indicate that such an approach would be unacceptable in all cases. Here, however, the Board has abdicated its responsibility to balance the interests at stake and to take into account the employer's compelling business reasons for its conduct under the special facts of this case. We reject the Board's contention for what amounts to a per se rule where the employees' § 7 rights are so thin and the employer's case so compelling as here.

The petition for review is granted; the cross-application for enforcement is denied.