902 F.2d 1297
 134 L.R.R.M. (BNA) 2137, 58 USLW 2692,
115 Lab.Cas. P 10,019
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
INTERNATIONAL UNION OF ELEVATOR CONSTRUCTORS, AFL-CIO, and
Local Union 3, International Union of Elevator
Constructors, AFL-CIO, Respondents.
 No. 88-2354.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 10, 1989.
Decided April 27, 1990.
 
 Steven B. Goldstein, Washington, D.C., for petitioner.
 Nicholas R. Femia, Washington, D.C., for respondents.
 Before JOHN R. GIBSON and MAGILL, Circuit Judges, and HEANEY, Senior Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Ray Ritz, as a matter of conscience, refused to enter a neutral gate at a construction site and report for work with his employer, Long Elevator and Machine Company, Inc., because another gate at the construction site was being picketed as a result of a labor dispute involving another subcontractor. He was suspended for his refusal to work behind the gate, and his unions, the International Union of Elevator Constructors, AFL-CIO, and Local Union 3, International Union of Elevator Constructors, AFL-CIO (collectively the "Unions"), filed a grievance on his behalf. In response, Long brought charges before the National Labor Relations Board. The Board, relying on Bricklayers & Stone Masons Union, Local No. 2 (Gunnar I. Johnson), 224 NLRB 1021 (1976), enforced, Bricklayers & Stone Masons Union, Local No. 2 v. NLRB, 562 F.2d 775 (D.C.Cir.1977), held that the Unions had violated section 8(b)(4)(ii)(A) of the National Labor Relations Act, 29 U.S.C. Sec. 158(b)(4)(ii)(A) (1982). On appeal, the Unions advance three basic arguments: (1) that Bricklayers is distinguishable from the present case; (2) that Bricklayers is wrong as a matter of law; and (3) that the Board improperly presumed that the Unions acted with a secondary objective. We affirm the Board's decision and enforce its order.
 
 
 2
 Mead-McClellan, Inc., was the general contractor on a project on which Long Elevator, Ritz's employer, was one of the subcontractors. The International Brotherhood of Electrical Workers (I.B.E.W.) picketed Soper Electric Company, another subcontractor at the site, regarding the wages and working conditions provided by Soper to its employees. In anticipation of the picketing, Mead-McClellan established a reserved gate system at the site; the west gate was reserved for neutral employers, and the east gate was reserved for Soper's use. A sign posted near the west gate stated that it was to be used by only certain contractors, including Long. The sign did not mention whether the suppliers of any contractor could use the gate. In contrast, no sign was posted indicating who could use the east entrance. Nevertheless, there was no picketing of the neutral west gate. The evidence indicates, and the ALJ found, that the reserved gate arrangement was observed by all of the parties.
 
 
 3
 Long sent Ritz to the site and instructed him to enter through the neutral gate. Ritz initially performed some tasks at the site. After he was at the site for several days, however, Ritz told Long's vice president, Patrick Long, that he refused to work at the site while a picket line existed in front of the east gate. Ritz said that his decision was a matter of conscience.
 
 
 4
 Long then suspended Ritz. The suspension ended three and one-half days later. Soon thereafter, the Unions filed a grievance alleging that Long had violated paragraph 2 of Article 14 of the collective bargaining agreement by disciplining Ritz. That provision of the agreement, entitled "Strikes and Lockouts," provided that work stoppages resulting from lawful picketing would not constitute a strike within the meaning of the article.[1] The Unions contended that, since the provision authorized Ritz's refusal to work, Long had committed an unfair labor practice by disciplining Ritz.
 
 
 5
 Long then filed a complaint with the National Labor Relations Board. The ALJ found that the Unions had not influenced Ritz's decision, but concluded that this fact was irrelevant. Relying on Bricklayers, the ALJ held that Ritz's refusal to enter a neutral gate did "not comport with what has been traditionally deemed to be primary activity," ALJ Op. at 5, and that "it has never been held to be primary activity when employees refuse to work for their employer who is a neutral in the dispute because picketing of another employer is taking place nearby on the common situs," id.
 
 
 6
 The ALJ concluded that the Unions had violated section 8(b)(4)(ii)(A)[2] of the National Labor Relations Act by attempting to enforce a contractual picket line clause protecting from discipline employees who refuse to enter a neutral gate. He also decided that, by attempting to enforce the contract clause through the grievance procedure, the Unions attempted to force Long to enter into an agreement in violation of section 8(e)[3] of the Act.
 
 
 7
 The Unions filed exceptions to the ALJ's decision with the Board, and the General Counsel filed a cross-exception. A panel of three Board members agreed with the ALJ that the Unions' interpretation of Article 14 of the collective bargaining agreement would violate section 8(e). 289 NLRB No. 132. The Board concluded that even though the grievance arose from the actions of only one employee, the theory behind the grievance would require Long to permit all of its employees to refuse to work at the site, notwithstanding the fact that they could enter through a neutral gate. Citing Bricklayers, the Board held that the Unions could neither encourage Long's employees to stop working nor seek to compel, through a grievance procedure, Long's acquiescence in a work stoppage by its employees. The Board also found the pursuit of the grievance to be coercive and rejected the Unions' arguments that the decisions in Newberry Energy Corp., 227 NLRB 436 (1976), and Congoleum Industries, 197 NLRB 534 (1972), compelled a contrary result.
 
 I.
 
 8
 The pivotal issue in this appeal is the propriety of the Board's application of Bricklayers to this case. The Unions argue that Bricklayers is inapposite because Bricklayers, unlike this case, involved a properly established reserved gate system. According to the Unions, the reserved gate system in this case was deficient for two reasons: (1) the pickets did not limit themselves to the east gate; and (2) the gates were not properly marked. This effort to distinguish Bricklayers is unpersuasive.
 
 
 9
 The ALJ found that there were no pickets at the neutral west gate. This finding is controlling if it is "supported by substantial evidence on the record considered as a whole." 29 U.S.C. Sec. 160(e) (1982); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 487, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). The Unions have not identified any testimony indicating that the west gate was picketed. At most, they have cited disputed testimony stating that the pickets came within several feet of the west gate.[4] See Tr. at 104. We conclude that there is adequate support in the record for the ALJ's finding that the west gate was not subject to picketing, and we reject the Unions' argument to the contrary.
 
 
 10
 The Unions argue that this case does not involve a valid reserved gate system because the gates were not properly marked. However, the ALJ found that, although the neutral west gate did not mention suppliers and there was no sign at the primary gate:
 
 
 11
 all the participants recognized the two-gate system. The IBEW pickets patrolled only the primary gate and did not picket the neutral gate. Likewise, there was no evidence that either gate was compromised by any contractor, subcontractor, or their suppliers. Therefore, I conclude that the reserve gate system established by Mead-McClellan was valid.
 
 
 12
 ALJ Op. at 5-6. Our study of the record reveals adequate support for these findings. Regardless, even if neutral employees had gone through the unmarked primary gate, the reserved gate system would still have been valid because:
 
 
 13
 The reserved gate system is a "one-way street." The separate gate system is "tainted" only where employees or suppliers of the primary employer use the reserved, "neutral" gate; however, if neutral employees use the primary's gate, voluntarily subjecting themselves to the coercive power of the union's picketing, no "taint" occurs.
 
 
 14
 Mautz & Oren v. Teamsters Local No. 279, 882 F.2d 1117, 1122 n. 4 (7th Cir.1989) (emphasis in original).
 
 
 15
 Not only do we reject the Unions' attempts to distinguish Bricklayers, but we conclude that the facts in Bricklayers are, in all relevant respects, essentially identical to those of this case. Bricklayers involved a reserved gate system established at a construction site. 562 F.2d at 778. Despite the availability of the neutral gate, employees of a neutral subcontractor refused to work at the site because of pickets at the primary gate. Id. at 778-79. After the neutral employer attempted to obtain a temporary restraining order, and after the matter was submitted to an arbitrator, the case found its way to the NLRB. Id. at 779-80. The Board found that the picket line clauses violated section 8(e) "when they were construed by the arbitrator to protect employees from discipline for refusing to pass through a neutral gate when a primary picket line was stationed elsewhere on the common work situs." Id. at 780. In the court of appeals, the unions litigating the case argued that the work stoppage should have been treated as " 'a lawful response to primary activity' and as 'permissible secondary effects of lawful primary activity.' " Id. at 786 (quoting the brief of the Petitioners in that case) (footnote omitted) (emphasis in original).
 
 
 16
 The District of Columbia Circuit engaged in a thorough discussion of the various interests at stake in Bricklayers. The court first emphasized that it was reviewing only the employees' refusal to enter through the neutral gate, and not the picketing at the primary gate. Id. at 784. The court's analysis then began "with the well established principle that separate contractors working on a construction site are not engaged in a joint enterprise, but instead retain their independent status." Id. (citing NLRB v. Denver Bldg. Trades Council, 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951)). The second crucial foundation for the court's decision was the fact that reserved gates had been designated. The court concluded that:
 
 
 17
 With the concept of separate gates in operation, it follows that a picket line at the neutral gate is the same in law as a picket line at a totally different job site.... By definition a neutral gate is for employees of neutral--uninvolved--employers. It follows, therefore, that a picket line on a construction site maintained at the neutral employer's gate constitutes secondary activity and is therefore a violation of Section 8(b)(4)(B) of the Act. Picket line clauses which seek to protect such secondary activity are in violation of Section 8(e) of the Act.
 
 
 18
 ... Similarly, under Section 8(e) an agreement allowing the employees of a neutral employer to strike in support of a primary strike is also an unfair labor practice. While the triggering event in such a case is a primary strike or dispute between the struck employer and its employees, the secondary strike or refusal by the employees of the neutral employer ... is secondary activity, with the objective of causing the neutral employer to cease to do business with, or to refuse to handle the goods of, the struck employer.
 
 
 19
 Id. at 785 (footnotes omitted) (emphasis added).
 
 
 20
 The court then held that "the picket line clauses as interpreted and applied by the arbitrator were clearly in violation of Section 8(e) as having authorized in advance a refusal to cross a secondary picket line." Id. at 786. The court rejected the Unions' attempts to characterize the neutral employees' conduct as a lawful response to primary conduct; the court believed that the activity:
 
 
 21
 at the neutral gate cannot be other than secondary conduct, whether the picket line be conceived of as "imaginary" or established there by live persons. It cannot be protected by the picket clause, because secondary conduct, whether in response to legitimate primary activity or in response to illegitimate secondary activity ... is illegal under both 8(b)(4)(B) and 8(e).
 
 
 22
 Id. The court also ruled that "[t]he failure to limit the picket clauses to lawful responses makes them per se unfair labor practices." Id. at 786-87 (emphasis in original). The court held it to be irrelevant that the Unions had not induced the employees' refusal to enter the work site, because "inducement, whether by unions or individuals, is simply not an element of a Section 8(e) violation. Section 8(e) prohibits the entering into of contract terms sanctioning a secondary boycott." Id. at 787 (emphasis in original). Finally, the court explicitly noted that "[a] contrary decision would undermine the right of the independent contractors to remain neutral in a labor dispute in which they were not involved," id., because "[t]he refusal to enter the neutral gate cannot be considered lawful activity without doing violence to the careful balance of the rights and responsibilities of unions and employees as delineated by the Supreme Court in [Denver Building, 341 U.S. 675, 71 S.Ct. 943]." Id.
 
 II.
 
 23
 Since Bricklayers is indistinguishable from this case,[5] the Board was justified in applying Bricklayers here unless Bricklayers was wrongly decided. Our scope of review is narrow in examining the Board's conclusion that Bricklayers controls this case. NLRB v. J. Weingarten, Inc., 420 U.S. 251, 267, 95 S.Ct. 959, 968-69, 43 L.Ed.2d 171 (1975). A "reasonably defensible" construction of the Act by the Board "should not be rejected merely because the courts might prefer another view of the statute." Ford Motor Co. v. NLRB, 441 U.S. 488, 497, 99 S.Ct. 1842, 1849, 60 L.Ed.2d 420 (1979). It is also significant that the Board in this case applied its earlier Bricklayers decision which was enforced by the D.C. Circuit; we have recently indicated our reticence to declare such a Board ruling enforced by another circuit wrong as a matter of law. See NLRB v. W.L. Miller Co., 871 F.2d 745, 748 (8th Cir.1989).
 
 
 24
 The Unions specifically contend that, for two reasons, we should not follow the Bricklayers analysis. First, they argue that Bricklayers rests upon the flawed premise that section 8(b)(4) proscribes uncoerced and uninduced individual responses to primary picketing. This contention merits only brief discussion because it ignores Bricklayers' holding that inducement is not an element of a Section 8(e) violation. 562 F.2d at 787. Furthermore, both sections 8(b)(4) and 8(e) apply only to the conduct of labor organizations and their agents, and we do not read Bricklayers as holding that those sections prohibit acts by individual workers, but only that they prohibit the actions of a union in utilizing a picket clause with respect to the conduct of the individual workers.
 
 
 25
 The Unions' second argument presupposes that Ritz's conduct was protected by section 7 of the Act. The Unions then argue that it would be illogical to construe sections 8(b)(4)(ii)(A) and 8(e) to prevent the Unions from protecting Ritz's right to engage in a sympathy strike. We agree with the Unions' contention that sections 7 and 8 must be read together, but we conclude, for the reasons given below, both that section 8(b)(4)(ii)(A) bars the union activity under review in this case and that Ritz's refusal to work was not protected by section 7.
 
 
 26
 The International Union states in its brief that "if conduct is violative of Section 8(b)(4) or 8(e), then an employee engaging in that conduct is not protected by Section 7, and an employer does not violate the Act by imposing discipline." (Br. of Int'l Union at 31). This conclusion is supported by commentators. Professor Getman has observed:
 
 
 27
 [T]he reach of section 7 has been reduced by finding limitations suggested not by its language but by other sections and policies of the act. Section 8(b) prohibits various types of concerted activity. Such specifically prohibited activity properly falls outside the protection of section 7. It would make little sense to hold that section 7 protects that which section 8(b) prohibits.
 
 
 28
 Getman, The Protection of Economic Pressure by Section 7 of the National Labor Relations Act, 115 U.Pa.L.Rev. 1195, 1210 (1967) (footnote omitted).
 
 
 29
 Similarly, Professor Archibald Cox stated that:
 
 
 30
 Although section 8(b) regulates only the conduct of labor organizations and section 7 deals with the rights of employees, it seems plain that the group activities which section 8(b) forbids a labor organization to lead must fall outside the protection of section 7 when employees engage in them either with or without the direction of a union. To hold otherwise would disregard legislative history and create an unwarranted anomaly. In the absence of union sponsorship there may be no need for government intervention to curtail undesirable employee activities, but surely the activities themselves have no greater claim to affirmative protection.
 
 
 31
 Cox, The Right to Engage in Concerted Activities, 26 Ind.L.J. 319, 325 (1951) (footnote omitted); accord Congoleum, 197 NLRB at 534 (Miller, Chairman, dissenting) ("If a labor organization is prohibited ... from engaging in certain types of secondary strikes, it would be anomalous for us to hold that employees who participate in such a prohibited secondary strike are engaging in protected activity"); R. Gorman, Basic Text on Labor Law: Unionization and Collective Bargaining 302 (1976) ("It is ... well established that concerted activity loses the protection of section 7 if its objective is either to compel the employer to violate section 8(a) of the Labor Act, or is such that the union would be responsible for an unfair labor practice under section 8(b)").
 
 A.
 
 32
 Labor disputes on a multi-employer construction site implicate the "dual congressional objectives of preserving the right of labor organizations to bring pressure to bear on offending employers in primary labor disputes and of shielding unoffending employers and others from pressures in controversies not their own." Denver Bldg., 341 U.S. at 692, 71 S.Ct. at 953. "The 'touchstone' and 'central theme' of Sec. 8(e) is the protection [from secondary pressures] of neutral employers ... which are caught in the middle of a union's dispute with a third party." Kaiser Steel Corp. v. Mullins, 455 U.S. 72, 84, 102 S.Ct. 851, 860, 70 L.Ed.2d 833 (1982); accord National Woodwork Mfrs. Ass'n v. NLRB, 386 U.S. 612, 638, 87 S.Ct. 1250, 1265, 18 L.Ed.2d 357 (1967). The essence of secondary pressure is that its "sanctions bear, not upon the employer who alone is a party to the dispute, but upon some third party who has no concern in it." Local 761, Int'l Union of Elec. Workers v. NLRB (General Electric), 366 U.S. 667, 672, 81 S.Ct. 1285, 1289, 6 L.Ed.2d 592 (1961) (quoting International Bhd. of Elec. Workers, Local 501 v. NLRB, 181 F.2d 34, 37 (2d Cir.1950), aff'd, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951)).
 
 
 33
 The use of reserved gates at a construction site became significant after the Supreme Court's decision in Denver Building. In that case, the issue was whether a union, which had a primary dispute with a subcontractor on a construction project, could picket the whole site in order "to force the general contractor on [the] project to terminate its contract" with the subcontractor who was the target of their picketing. 341 U.S. at 677, 71 S.Ct. at 946. The Supreme Court held that the picketing violated section 8(b)(4)(A) because the various contractors on the site were independent. Id. at 689-90, 71 S.Ct. at 951-52.
 
 
 34
 After Denver Building, reserved gates have played an important role in accommodating the interests of the various parties when a labor dispute erupts at a construction site. Once reserved gates are properly established, the neutral gate is conceptually equivalent to a distinct work site from the gate that has been reserved for the struck employer. See Bricklayers, 562 F.2d at 785. Thus, since a valid reserved gate system was in operation at the work site in this case, it would have been presumptively unlawful for the I.B.E.W. to picket the neutral gate. See Mautz & Oren, 882 F.2d at 1121-24. Moreover, if the I.B.E.W. had engaged in such secondary picketing, the Unions would have violated section 8(e) if they had forced Long, a neutral employer, to agree to allow its employees to honor that secondary picket line. NLRB v. Bay Counties Dist. Council of Carpenters, 382 F.2d 593, 594 (9th Cir.1967), cert. denied, 389 U.S. 1037, 88 S.Ct. 772, 19 L.Ed.2d 825 (1968); Drivers Local Union No. 695 v. NLRB, 361 F.2d 547, 549-53 (D.C.Cir.1966); Truck Drivers Union Local No. 413, Int'l Bhd. of Teamsters v. NLRB, 334 F.2d 539, 543 (D.C.Cir.), cert. denied, 379 U.S. 916, 85 S.Ct. 264, 13 L.Ed.2d 186 (1964). Recognizing these doctrines, we see no reason why the Unions should be able to force Long to permit its employees to act as if there were a secondary picket at the neutral gate.[6]
 
 
 35
 The Board argues with great force that the Unions are attempting to do in this case what they have been unable to do in Congress, that is, overrule Denver Building. In Woelke & Romero Framing v. NLRB, 456 U.S. 645, 102 S.Ct. 2071, 72 L.Ed.2d 398 (1982), the Supreme Court described organized labor's efforts to convince Congress to authorize unions to picket an entire construction site whenever they have a dispute with one of the independent contractors working at the site. See id. at 661-62, 102 S.Ct. at 2080-81, see also J.F. Hoff Elec. Co. v. NLRB, 642 F.2d 1266, 1283-84 & nn. 34-38 (D.C.Cir.1980) (Wilkey, J., dissenting), cert. denied, 451 U.S. 918, 101 S.Ct. 1997, 68 L.Ed.2d 310 (1981). Congress addressed labor's concerns by enacting the construction industry proviso to section 8(e). See Pub.L. No. 86-257, 73 Stat. 543-44 (1959). The fact that Congress formulated only a limited response to the labor organizations' objections underscores the strength of Denver Building, and consequently the strength of Bricklayers.
 
 
 36
 The Unions argue that the instant case involves the right of an individual worker to engage in a sympathy strike without being subject to reprisals. We read Bricklayers as treating this very issue. In Bricklayers, the court responded to an identical argument by focusing attention on the actions at the neutral gate rather than on the picketing at the primary gate. The court stated:
 
 
 37
 This is the "underlying conduct," the conduct of the [neutral] employees at the neutral gate, which is sought to be protected here.
 
 
 38
 This is what the dispute is all about. The "underlying conduct" which is "sought to be protected" here is not the primary picket line at the [primary] gate, but the "responses" to the "lawful primary activity," i.e., the refusal to enter at the neutral gate.
 
 
 39
 562 F.2d at 786 (emphasis in original).
 
 
 40
 Similarly, in this case, conduct at the neutral gate is at issue, as the central argument of the Unions demonstrates. The conclusion of Bricklayers is thus equally applicable here. Bricklayers stated that:
 
 
 41
 This "response," this "underlying conduct," at the neutral gate cannot be other than secondary conduct, whether the picket line be conceived of as "imaginary" or established there by live persons. It cannot be protected by the picket clause, because secondary conduct, whether in response to legitimate primary activity or in response to illegitimate secondary activity (for example, [a] picket line, real or imaginary), is illegal under both 8(b)(4)(B) and 8(e). The failure to limit the picket clauses to lawful responses makes them per se unfair labor practices.
 
 
 42
 A contrary decision would undermine the right of the independent contractors to remain neutral in a labor dispute in which they were not involved.
 
 
 43
 Id. at 786-87 (emphasis in original). Bricklayers thus prohibits a union from utilizing the picket clause with respect to the secondary conduct of individual workers.
 
 B.
 
 44
 In support of their contention that Ritz's conduct was protected by the labor law, the Unions cite a multitude of cases holding that an employee may engage in a sympathy strike.[7] None of these cases contains an analysis of the secondary implications of a neutral employee's refusal to enter an unpicketed neutral gate.[8] The crucial distinction between this case and all but one of the cases[9] upon which the Unions rely is that Ritz, unlike the employees in those cases, was not being asked to cross a picket line. The absence of a picket line at the neutral gate in this case is not accidental; the Board and the courts have crafted rules governing the permissible location of picketing which mediate between a union's interest in pressuring a primary employer and the right of neutral employers to be free from secondary pressure. See, e.g., General Electric, 366 U.S. at 671-81, 81 S.Ct. at 1288-94; Sailors' Union of the Pacific (Moore Dry Dock), 92 NLRB 547, 547-52 (1950). The general principle underlying these cases is that businesses are immune from picketing if their operations are sufficiently removed from the normal operations of the struck employer. See, e.g., General Electric, 366 U.S. at 671-81, 81 S.Ct. at 1288-94; J.F. Hoff, 642 F.2d at 1269-76. The force of this principle in analyzing a common situs situation is perhaps seen most clearly in General Electric. In that case, General Electric had reserved a gate at one of its plants for the exclusive use of independent contractors. 366 U.S. at 668-69, 81 S.Ct. at 1287. A labor dispute arose between General Electric and a union representing many of its employees, and the union picketed all of the gates at the plant. Id. at 670, 81 S.Ct. at 1287-88. General Electric claimed that picketing in front of the gate reserved for independent contractors violated section 8(b)(4)(A). Id. The Supreme Court held that picketing of such a reserved gate was prohibited if, but only if, the work done by the workers using the gate was "unrelated to the normal operations" of the struck employer and was "of a kind that would not, if done when the plant were engaged in its regular operations, necessitate curtailing those operations."[10] Id. at 681, 81 S.Ct. at 1294 (quoting United Steelworkers v. NLRB, 289 F.2d 591, 595 (2d Cir.1961)).
 
 
 45
 Obviously, there is a certain "community of interest" between various contractors on a construction project. Woelke & Romero Framing, 456 U.S. at 661, 102 S.Ct. at 2081. Nevertheless, it is the holding of Denver Building that the shared interest of the various contractors at a particular construction site is not so great as to justify a rule allowing them all to be picketed merely because a union has a dispute with one of them. See Denver Bldg., 341 U.S. at 685-92, 71 S.Ct. at 949-53. In this case, Ritz's work would not have directly assisted Soper, the struck employer, at the expense of the striking employees. Admittedly, Soper may have been indirectly assisted if Ritz had continued to work at the site for Long. However, Denver Building stands for the proposition that the connection between independent contractors, standing alone, is so tenuous that pressure on a neutral contractor is deemed to be secondary.[11] Although unions have tried to get Congress to reverse the Denver Building rule, it is still in force. We conclude that it necessarily follows from Denver Building that the Unions in this case were attempting to enmesh a neutral employer in a dispute that was not its own in violation of section 8(b)(4)(ii)(A).
 
 III.
 
 46
 Finally, the Unions contend that the Board was not entitled to presume that they acted with a secondary objective. They argue that the Board demonstrated only that the Unions' actions had secondary effects, but not that the Unions had a secondary objective. This argument is not persuasive, as we believe that the Unions have mischaracterized the Board's holding. The essence of the Board's holding is that, just as the Unions could not lawfully have encouraged Long's employees to walk out in support of the I.B.E.W. in its dispute with Soper, the Unions could not attempt to force Long, through the grievance procedure, to allow an employee to stop work in support of Soper. The ALJ stated that Ritz's "response (in refusing to enter a neutral gate) does not comport with what has been traditionally deemed to be primary activity," ALJ Op. at 5, and that "in cases like this, it has never been held to be primary activity when employees refuse to work for their employer who is a neutral in the dispute because picketing of another employer is taking place nearby on the common situs," id. We believe that these determinations by the ALJ and the Board are not presumptions, but rather are applications, to a specific set of facts, of the statute that the Board is charged with administering. We thus reject the Unions' argument.
 
 
 47
 Moreover, the Unions' argument would be unsuccessful even if it were correct, because the Board could have justifiably presumed, on these facts, that the Unions did possess a secondary objective. Under the guidelines announced in Moore Dry Dock, there would have been a presumption of secondary intent if Soper's employees had picketed at the validly established neutral gate through which Ritz was asked to proceed. See Mautz & Oren, 882 F.2d at 1121-24. The Board could reasonably conclude that a similar presumption should arise when the Unions attempted to force a neutral employer to accept an interpretation of its collective bargaining agreement authorizing its employees, with impunity, to refuse to enter a construction site through a neutral gate if picketing was occurring anywhere on the site.
 
 
 48
 Finding no error in the Board's disposition of this case, we enforce the Board's order.
 
 
 49
 HEANEY, Senior Circuit Judge, dissenting.
 
 
 50
 I write separately to indicate my strong disagreement with the statement of the Board and the majority that Ritz's refusal to cross the IBEW picket line was not protected activity under section 7 of the National Labor Relations Act, 29 U.S.C. Sec. 157. Section 7 provides: "Employees shall have the right ... to engage in ... concerted activities for the purpose of ... mutual aid or protection." Id. Section 7 has been held, by this circuit and most others, to encompass the right of an employee to refuse to cross another union's lawful picket line. John Morrell & Co. v. Local Union 304A, 804 F.2d 457, 461 n. 5 (8th Cir.1986); Amcar Div., ACF Indus., Inc. v. NLRB, 641 F.2d 561, 566 (8th Cir.1981); see also NLRB v. Browning-Ferris Indus., Chem. Servs., Inc., 700 F.2d 385, 387 (7th Cir.1983) and cases cited therein; NLRB v. Southern California Edison Co., 646 F.2d 1352, 1362-63 (9th Cir.1981).[12]
 
 
 51
 Justice Hugo Black stated the basis for the right in his concurring and dissenting opinion in NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953):
 
 
 52
 Section 7 of the Taft-Hartley Act, 29 USC Sec. 157 recognizes a right of employees to work together in "concerted activities" for their mutual aid and protection. One way some union men help others is to refrain from crossing picket lines. Habitual respect for union picket lines has long been the practice of union men. This practice has been a prized asset of the unions. The Taft-Hartley Act was designed to regulate and restrict the type of concerted activities in which employees could engage. But even that Act did not attempt to deprive unions of the advantage of a policy that required union men to respect picket lines. In Sec. 8(b)(4)(D) of the Act, 29 USC Sec. 158(b)(4)(D), Congress specifically declared that none of its union-restrictive provisions should be construed to make it unlawful for a man to refuse to cross a picket line thrown up to support a lawful strike. Consequently, I agree with the Labor Board that it was an unfair labor practice for this employer to discharge a union employee who refused to cross a picket line.[13]
 
 
 53
 Id. at 81, 73 S.Ct. at 525 (Black, J., concurring in part, dissenting in part).
 
 
 54
 The right to refrain from crossing a picket line can be waived. Rockaway, 345 U.S. at 80, 73 S.Ct. at 524-25; Amcar, 641 F.2d at 566; Montana-Dakota Utilities Co. v. NLRB, 455 F.2d 1088, 1091 (8th Cir.1972). Moreover, an employee who refuses to cross a picket line can be replaced under the rules generally applicable to economic strikers. NLRB v. Browning-Ferris Indus., 700 F.2d at 388; NLRB v. Southern California Edison Co., 646 F.2d at 1368.
 
 
 55
 Here, the Board concedes that the IBEW was engaged in "Lawful primary picketing of Soper," the electrical subcontractor. There is, moreover, no evidence in the record that the collective bargaining agreement between the Long Elevator Company and the Elevator Constructors Union waived the right of individual union members to respect the picket line of another union, so long as they do so as a matter of individual choice without any direction or coercion from the union and without the intent to coerce his employer to cease doing business with another. There is no evidence that Ritz had the latter intent.
 
 
 56
 The Board and this court reason that the rules outlined above cannot be applied in this case because the building owner had established a neutral gate, and thus, Ritz's activity in respecting the picket line was not "primary activity." They cite no cases directly for this unusual proposition, and I have been unable to find one. Nor can this proposition be sustained as necessary to balance the rights of employers and employees. In fact, such a rule would destroy a right considered to be of great importance to every union member--the right to respect the picket line of another union.
 
 
 57
 First, this issue has been previously addressed. The Board in Congoleum Industries, Inc., 197 NLRB No. 52, 80 LRRM 1675 (1972), held that section 8(a)(1) of the Act was violated by an employer's discharge of four employees who refused to enter a job site through a neutral gate because of informational picketing at a reserve gate. The Board now suggests that Congoleum Industries has no precedential value because the issue of whether the employee's refusal to enter the neutral gate might violate section 8(b)(4) of section 8(e) had not been litigated or argued. It is difficult for me to accept that reading of Congoleum Industries in light of Chairman Miller's dissenting opinion.[14]
 
 
 58
 Second, the decision in Bricklayers & Stone Masons Union v. NLRB, 562 F.2d 775 (D.C.Cir.1977), upon which the Board and the majority rely, does not support their position. In Bricklayers, the Board found that the picket line clauses of the bricklayers', laborers', engineers', and plumbers' unions were in violation of section 8(e) of the Act because the clauses were broad enough as written or applied to sanction refusals to cross secondary picket lines, and the clauses were not saved by virtue of the construction industry proviso to section 8(e). Id. at 786-88. Bricklayers cannot be fairly cited for the proposition that the refusal of Ritz to cross the picket line was not protected by section 7.
 
 
 59
 In addition, I note that the result in Congoleum Industries does not change the balance of power between the parties; permitting an individual employee to respect a picket line under the circumstances in this case will not unduly favor employees nor prejudice employers. Each employee knows that if he respects the picket line of another union, he may be temporarily or permanently replaced as an economic striker. Thus, the union member's action in respecting the picket line of another is not risk-free; he may lose his job. The employer, on the other hand, can replace the employee as an economic striker and continue with his work.
 
 
 60
 The only issue before this court is whether "the union, by filing a grievance on behalf of its member, who was disciplined for refusing to enter a reserve 'neutral gate,' is attempting to illegally enforce the 'picketing clause' in the collective bargaining agreement." Decision of NLRB at 1 (emphasis added). The answer to this question turns on whether there is substantial evidence in the record as a whole to support the Board's finding that a neutral gate had been established. I do not believe the record supports this finding for the following reasons:
 
 
 61
 1. The single building being rehabilitated had two entrances: one on the southeast corner of the building; the other on the southwest corner.
 
 
 62
 2. The east gate was marked; the west was not.
 
 
 63
 3. Two snow fences were erected on the property. The west fence was to the east of the west entrance, and the east fence was to the west of the east entrance. To put the matter simply, the fences created a closed area between the two entrances.
 
 
 64
 4. The pickets spent most of their time sitting in a parked car in front of the premises.
 
 
 65
 5. When the pickets walked, they walked from one fence to the other. Thus, they never passed in front of either entrance.
 
 
 66
 Under these circumstances, an objective observer would not have realized that a neutral gate had been established. Thus, even if one accepts the logic of the Bricklayers case with respect to the issue before us, I would deny enforcement because the Board's finding that a neutral gate had been established is not adequately supported on the record.[15]
 
 CONCLUSION
 
 67
 The majority, at most, holds that the Elevator Constructors Union violated the Act by filing a grievance attempting to illegally enforce the picketing clause in their collective bargaining agreement with the Long Elevator and Machine Co., Inc. Any language in the opinion that characterizes Ritz's activities is dicta and is, moreover, inconsistent with the plain language of the National Labor Relations Act, congressional intent, and decided cases. For the reasons stated above, I dissent from the result reached by the majority.
 
 
 
 [1]
 Article 14, paragraph 2 of the Collective Bargaining Agreement between Long and Local 3 provided:
 No strike will be called against the Employer by the Union unless the strike is approved by the International Office of the International Union of Elevator Constructors. Sufficient notice shall be given to the Employer before a strike shall become effective. Except in the case of contract service work as specified in Article IX of this agreement, work stoppages brought about by lawful picketing or strikes by building trades local unions affiliated with Building Trades Councils shall not constitute a strike within the meaning of this Article.
 
 
 [2]
 That section provides that a labor organization commits an unfair labor practice by "forcing or requiring any employer or self-employed person to join any labor or employer organization or to enter into any agreement which is prohibited by subsection (e) of this section." 29 U.S.C. Sec. 158(b)(4)(ii)(A)
 
 
 [3]
 Section 8(e) states, in relevant part, that:
 It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void: Provided, That nothing in this subsection shall apply to an agreement between a labor organization and an employer in the construction industry relating to the contracting or subcontracting of work to be done at the site of the construction, alteration, painting, or repair of a building, structure, or other work....
 29 U.S.C. Sec. 158(e).
 
 
 [4]
 One witness testified that picketing occurred only from the east gate to the center of the site. Tr. at 65
 
 
 [5]
 The dissent states that "Bricklayers cannot be fairly cited for the proposition that the refusal of Ritz to cross the picket line was not protected by section 7," infra at 1310. This statement is irrelevant, because our case involves Ritz's refusal to enter an unpicketed neutral gate
 
 
 [6]
 In his Congoleum dissent, Chairman Miller conducted a similar analysis. He concluded, after making the following observation, that section 7 did not protect a worker's refusal to enter through a neutral gate:
 [I]n Drivers Local 695, Teamsters [152 NLRB 577 (1965), enforced, 361 F.2d 547 (D.C.Cir.1966) ], we held that a clause in a collective agreement which sought to insulate employees from discipline for refusing to cross unlawful secondary picket lines was violative of Section 8(e) of our Act. Underlying that holding must be the concept that employees cannot find justification for failing to perform their legal duties where their only reason for abstaining therefrom is a desire to involve their neutral employer in someone else's labor dispute.
 Congoleum, 197 NLRB at 535 (Miller, Chairman, dissenting) (emphasis in original).
 
 
 [7]
 NLRB v. Rockaway News Supply Co., 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1953); John Morrell & Co. v. Local Union 304A of the United Food & Commercial Workers, 804 F.2d 457 (8th Cir.1986) (per curiam), cert. denied, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987); Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB, 797 F.2d 1027 (D.C.Cir.1986); International Bhd. of Elec. Workers Local 387 v. NLRB, 788 F.2d 1412 (9th Cir.1986) (per curiam); United States Steel Corp. v. NLRB, 711 F.2d 772 (7th Cir.1983); NLRB v. Browning-Ferris Indus., 700 F.2d 385 (7th Cir.1983); NLRB v. Southern Cal. Edison Co., 646 F.2d 1352 (9th Cir.1981); Amcar Div., ACF Indus. v. NLRB, 641 F.2d 561 (8th Cir.1981); NLRB v. Gould, 638 F.2d 159 (10th Cir.1980), cert. denied sub nom. 452 U.S. 930, 101 S.Ct. 3065, 69 L.Ed.2d 430 (1981); NLRB v. Alamo Express, 430 F.2d 1032 (5th Cir.1970), cert. denied, 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1971); NLRB v. Southern Greyhound Lines, 426 F.2d 1299 (5th Cir.1970); Business Serv. by Manpower, 272 NLRB 827 (1984), enforcement denied, 784 F.2d 442 (2d Cir.1986); Butterworth-Manning-Ashmore Mortuary, 270 NLRB 1014 (1984), review denied sub nom. 767 F.2d 933 (9th Cir.1985); Ashtabula Forge, 269 NLRB 774 (1984); Torrington Constr. Co., 235 NLRB 1540 (1978), partially rev'd on other grounds, Butterworth, 270 NLRB at 1015; Newberry Energy Corp., 227 NLRB 436 (1976); Congoleum Indus., 197 NLRB 534 (1972); and Montana-Dakota Util. Co., 189 NLRB 879 (1971), enforcement denied, 455 F.2d 1088 (8th Cir.1972)
 
 
 [8]
 The cases cited by the Unions fall into five categories. The largest group consists of cases where a worker, usually a truck driver, refused to cross a picket line located at the premises of a customer or supplier of his employer. See Rockaway News Supply, 345 U.S. at 72-81, 73 S.Ct. at 520-25; Local Union 1395, 797 F.2d at 1028 n. 1 & 1029; Business Serv., 784 F.2d at 446-54; Browning-Ferris, 700 F.2d at 386; Montana-Dakota Util. Co., 455 F.2d at 1091; Alamo Express, 430 F.2d at 1036; Southern Cal. Edison, 646 F.2d at 1363-64; and Torrington, 235 NLRB at 1540. The Business Services opinion contains a detailed exposition by Judge Friendly of the varied treatment which that fact pattern has received over the years. See 784 F.2d at 446-51. A second category is composed of cases stating that employees had a statutory right to honor a picket line directed at their employer by a union of which they were not a member. See Southern Cal. Edison, 646 F.2d at 1363; Amcar, 641 F.2d at 562-66; Southern Greyhound Lines, 426 F.2d at 1300-01; Butterworth, 270 NLRB at 1014-15; Ashtabula Forge, 269 NLRB at 774-75. In the third group of cases, courts held that an employee's refusal to physically cross a picket line was protected by section 7. See Local 387, 788 F.2d at 1413-14; United States Steel, 711 F.2d at 774-76; Gould, 638 F.2d at 161-65; Newberry Energy Corp., 227 NLRB at 436. The fourth group adds little of value to the rest of the cases, because it contains only vague, generalized dicta. See Morrell, 804 F.2d at 461 n. 5. The last category contains only one case: Congoleum Industries, 197 NLRB 534
 In Congoleum, the Board affirmed without discussion an ALJ's findings and conclusions. The ALJ's opinion, which is appended to the Board's opinion, reveals that the case involved a reserved gate system that had been established at an industrial plant. See id. at 545-46. That case could be distinguished from this one because the entrance to the reserved gate in Congoleum was partially blocked. Id. at 546. Nevertheless, the only fair reading of the case seems to be that the trial examiner held that the employees had a right to refuse to enter through the neutral gate. See id. at 547. As the Board explicitly made clear, however, that conclusion was rendered without any consideration of sections 8(b)(4) and 8(e). See id. at 534 n. 1. Indeed, Chairman Miller, the only Board member who addressed the secondary implications of the case, dissented from the decision and order precisely because he felt that the secondary concerns should have been considered, and that they should have led to an opposite result. See id. at 534-35 (Miller, Chairman, dissenting). The majority's only response to the dissent was to state, in the aforementioned footnote, that it was not deciding whether the conduct in that case violated section 8(b)(4) or section 8(e). See id. at 534 n. 1.
 The significance of the secondary implications in cases such as these was discussed by Professor Getman:
 The Taft-Hartley and Landrum-Griffin amendments ... severely limited the extent to which economic pressures can be used to make common cause with employees of other companies. The policy that employees should be free to engage in secondary pressure was largely replaced by a policy against the spread of industrial disputes. Most traditional forms of secondary pressure were declared unfair labor practices by the additions of sections 8(b)(4) and 8(e) and hence are unprotected.
 Getman, supra, 115 U.Pa.L.Rev. at 1223-24 (footnote omitted).
 
 
 [9]
 The case that did not involve the crossing of a picket line, Congoleum, contains no analysis of the issue before us, and thus provides scant guidance in the present case. See supra note 5 (discussing Congoleum ). The majority of the Board in that case explicitly stated that it was not deciding whether the employees had violated section 8(b)(4) or 8(e), because "[t]he legality of the conduct under th[o]se sections was neither alleged in the complaint, litigated at the hearing, [n]or indeed argued in the briefs of the parties or at the oral hearing held before the Board." 197 NLRB at 534 n. 1
 
 
 [10]
 It is not necessary in this case to decide the precise relationship between the Supreme Court's decisions in General Electric and in Denver Building. Compare J.F. Hoff, 642 F.2d at 1269-76 with id. at 1277-84 (Wilkey, J., dissenting). It is enough to recognize the fact that both General Electric and Denver Building support the proposition that an employer is not a legitimate object of picketing by a union engaged in a dispute with a different employer simply because the two businesses are operating on a common situs
 
 
 [11]
 The parties agree that the only relevant connection between Long and Soper was that both were independent subcontractors at the site in question. Thus, this is unlike a situation in which an allegedly neutral employer delivers supplies to be used by the struck employer. See J.F. Hoff, 642 F.2d at 1268-77 (holding that a neutral gate was tainted when supplies which were to be used by the struck employer, but were owned by the owner of the construction project, were delivered through the gate)
 
 
 [12]
 The Board's most recent pronouncement on the issue appears to be in Torrington Construction Co., 235 NLRB 211, 99 LRRM 1135 (1978):
 The right to engage in a sympathy strike or to honor another union's picket line is a right created and protected by the Act. This right may of course be waived....
 The Board in Redwing Carriers, supra, and later cases created a partial exception to the right to refrain from crossing a picket line. The exception has recognized the right of an employer to continue its business operations efficiently. To this end, the Board has recognized the right of an employer to replace an employee who engages in a partial refusal to work by refusing to cross a picket line with an employee who is willing to perform all job duties when efficient business operations so dictate. The latter right thus reflects a balancing of employee protected activity with employer operation of a business. This, of course, does not mean that the activity of the employee who honors the picket line is unprotected. While the employee may be replaced if the evidence clearly discloses that the sole purpose was the continued efficient operation of the business, such employee may not be discharged.
 
 
 [99]
 LRRM at 1136 (emphasis added) (footnotes omitted)
 
 
 [13]
 In NLRB v. Peter Cailler Kohler Swiss Chocolates Co., 130 F.2d 503 (2d Cir.1942), Judge Learned Hand stated his view of the type of activity protected by section 7
 When all the other workmen in a shop make common cause with a fellow workman over his separate grievance, and go out on strike in his support, they engage in a "concerted activity" for "mutual aid or protection," although the aggrieved workman is the only one of them who has any immediate stake in the outcome. The rest know that by their action each one of them assures himself, in case his turn ever comes, of the support of the one whom they are all then helping; and the solidarity so established is "mutual aid" in the most literal sense, as nobody doubts. So too of those engaging in a "sympathetic strike," or secondary boycott; the immediate quarrel does not itself concern them, but by extending the number of those who will make the enemy of one the enemy of all, the power of each is vastly increased. It is one thing how far a community should allow such power to grow; but, whatever may be the proper place to check it, each separate extension is certainly a step in "mutual aid or protection."
 Id. at 505-06 (citation omitted).
 
 
 [14]
 The dissent stated:
 Despite that guarantee against involvement, these employees chose not to utilize their free entryway and voluntarily abstained from the work which an employer may rightfully require his employees to perform if they expect, in turn, to be retained in his employ. We have not only affirmed the neutral employer's right to require such work of his employees despite their concern with someone else's labor dispute, but have even held that he may not contract away that right.
 
 
 [89]
 LRRM at 1681 (Miller, Chairman, dissenting)
 
 
 [15]
 I do not reach the question of whether the union violated the Act by filing a grievance with Ritz's employer. If the purpose of the grievance was to vindicate the right of any employee of Long to respect the picket line of another union irrespective of the circumstances that led to the picketing, then the union was probably guilty of an unfair labor practice. The majority states in its opinion that this was its purpose, and the record would seem to support the view that this was the union's purpose
 On the other hand, if the purpose of the union was simply to vindicate Ritz's right to respect a picket line pursuant to section 7 of the National Labor Relations Act, then a different result would be required. Ritz probably would have been better served in this instance if he had been advised that the preferred remedy for him would be to file an unfair labor practice charge with the National Labor Relations Board.